(No. 11272.—Judgment reversed.)

THE ILLINOIS MALLEABLE IRON COMPANY, Appellee, vs.
JAN MICHALEK et al.—(JAN MICHALEK, Appellant.)

*Opinion filed June 21, 1917.*

1. INJUNCTION—*employees not under contract cannot be en-
joined from striking.* Employees who are not under contract with
their employer cannot be enjoined from quitting work or striking
when they please, and they have a right peaceably to assemble or
hold meetings and discuss matters in which they are interested or
which they deem to be for their benefit and to advertise and give
notice of such meetings.

2. SAME—*what may be considered to determine whether there
has been a violation of injunction.* In order to determine whether
there has been a violation of an injunction it is proper to refer
to the bill of complaint as a whole, and the answer thereto, as
well as the injunction order itself, for the purpose of ascertaining
the matters in issue between the parties in the controversy.

3. SAME—*what is not a violation of injunction against calling
employees "scabs."* Where strikers have been enjoined from ad-
dressing employees as "scabs," an allusion or reference to them as
"scabs" in a newspaper notice of a strikers' meeting is not a vio-
lation of the injunction order, where the plain object of the bill
of complaint and the order was to prohibit the strikers from. call-
ing the employees "scabs". by word of mouth or using language
calculated to provoke a breach of the peace.

4. SAME—*what is not a violation of an injunction order against
strikers.* An injunction order designed to prevent strikers from
interfering with or stopping the employer's business, from inducing
employees to quit work and from publishing or sending out circu-
lars or other communications to the employees to persuade them to
quit work, is not violated by a newspaper notice relating to strik-
ers' meetings and requesting the public in general to stay away
from the shops where the strike was on.

CARTWRIGHT, DUNN and DUNCAN, JJ., dissenting.

APPEAL from the Circuit Court of Cook county; the
Hon. FREDERICK A. SMITH, Judge, presiding.

FRED SCHMIDT, (W. B. RUBIN, of counsel,) for ap-
pellant.

W. T. ALDEN, C. R. LATHAM, and H. P. YOUNG, (WALTER GORDON MERRITT, and CHARLES MARTIN, of counsel,) for appellee.

Mr. JUSTICE CRAIG delivered the opinion of the court:

Appellee, the Illinois Malleable Iron Company, on June 18, 1916, filed its bill for an injunction in the circuit court of Cook county against appellant and others, setting up that complainant is an Illinois corporation engaged in the manufacture of castings and in the general foundry business in the city of Chicago; that it was conducting an "open" shop; that on May 1, 1916, approximately 1000 men in complainant's employ went on a strike; that a committee of the strikers had presented to the complainant certain demands as to wages and working hours and conditions, and an agreement, which the complainant had refused to enter into; that a majority of complainant's employees were of Polish nationality; that the American Federation of Labor, which was made a party defendant, had caused the strikers to be organized into a union known as the Malleable Casting Workers' Union, and that the members of such union and another union known as the Illinois Malleable Iron Workers' Union, who were also on a strike, had been picketing the plant and factory of complainant and intimidated and attempted to intimidate employees of the complainant and threatened them with violence; that almost 200 molders, through fear of violence, had quit complainant's employ, and because of the threats and violence the complainant would be unable to obtain employees; that defendants have since May 1 pursued a course of threats and personal violence and intimidation towards the employees of the complainant, so that it could not peaceably pursue its business and has suffered and will suffer great financial loss.

Pursuant to the prayer of the bill it was ordered that a writ of injunction issue, and said writ was issued June 18, 1916, commanding the defendants named in the bill, among

them the appellant, Jan Michalek, to desist and refrain from
in any way interfering with, obstructing or stopping the
business of the complainant, or of the agents, servants or
employees of the complainant engaged in the operation of
the business of complainant; from picketing or maintain-
ing any picket at or near the premises of the complainant
or on the routes followed by employees of the complainant
in going to or from their homes and to and from the place
of business of the complainant; from watching and spying
upon the complainant's place of business and upon the em-
ployees of complainant; from assaulting or intimidating,
by threats or otherwise, the employees of the complainant;
from congregating about or near the place of business of
complainant or any place where the employees of complain-
ant are lodged or boarded, for the purpose of compelling,
inducing or soliciting employees of the complainant to leave
their employment; from entering upon the grounds or place
of business or places of employment where employees of
complainant are at work, for the purpose of hindering or
obstructing the business of such employees; from following
employees of complainant to their homes or other places or
from calling upon such employees for the purpose of in-
ducing them to leave the employment of complainant or
molesting or intimidating such employees or their families;
from compelling or inducing or attempting to compel or
induce any of the employees of the complainant to re-
fuse or fail to do their work or to perform their duties
as such employees; from publishing or causing to be pub-
lished and from sending out circulars or other communica-
tions to the employees of the complainant calling upon and
urging such employees and attempting to persuade the em-
ployees of the complainant to quit their said work; and
from addressing to any of the complainant's employees the
word "scab," or words of similar import to hatred, criticism,
censure, scorn, disgrace or annoyance, because of their em-
ployment by the complainant.

Thereafter the appellee filed its verified petition in said court, representing that subsequent to the issuing of the injunction respondents named in the petition, Jan Michalek and Stanislaw Kaszubiski, in utter disregard of the terms of said injunction writ, and for the purpose of inducing the said employees of the petitioner to quit their said employment, and for the purpose of intimidating, harassing, annoying and bringing the said employees of the petitioner into disgrace, criticism and annoyance, on July 21, 1916, caused to be published in a newspaper published in the Polish language in the city of Chicago, and known as the *Dziennik Ludowy,* which had a wide and general circulation among Polish workmen employed in foundries and factories such as that owned and operated by the petitioner, an article with the signatures of said respondents thereto attached, and that a correct translation of the said article so appearing in said newspaper is as follows:

*"To the strikers of the Illinois Malleable Iron Co.:*

"Strikers' meetings are held three times a week, at night. At these meetings we have crowds of people. Strikers from the above concern have agreed to stay out on strike until the company will give in to their demands. We have made up our minds not to pay any attention to the company's chasers, who make all kinds of promises and draw men into the shops on account of these promises, because the scabs are cursing not only themselves but all others, and they claim they will strike again because they are being cheated by the company's foremen and also because they did not receive the wages which the foremen promised them. These foremen have promised gold apples on trees, and now the scabs are only getting $1.61 per day, and they are required to give up money to the bosses.

"The committee informs the public, in the name of the strikers, to stay away from the struck shops, as this would harm us in the battle we have been fighting for twelve weeks, because we are not only fighting for those who are striking but also for those who are working there. We request all the workingmen to attend the meeting on Sunday, the 23rd inst., at two o'clock.

COMMITTEE.

JN. MICHALEK, *President,*

STANLEY KASZUBISKI, *Secretary."*

It is further alleged in the petition that in and by said notice the injunction writ issued by the court is recklessly disregarded; that the employees of the petitioner are called "scabs;" that the intended allegation that the employees of the petitioner are being cheated by the petitioner's foremen and do not receive the wages they were promised by the foremen is false and untrue, and that the statement that the employees of the petitioner, called in said notice "scabs," are only getting $1.61 per day is false and untrue, and the statement that they were required to give up money to the bosses (meaning the foremen and superintendent of the petitioner) is false and untrue; that the publication of said notice, as the petitioner is informed and believes, prevented former employees of the petitioner from returning to their said employment, to the injury, damage and annoyance of the petitioner. The petition concluded with a prayer that a rule be entered upon the respondents, Jan Michalek and Stanislaw Kaszubiski, to show cause within a short day to be fixed by the court why they should not be attached and punished for contempt of court in violating the injunction theretofore issued.

A rule to show cause was entered, returnable August 29, and a hearing thereon was continued from time to time by agreement. Appellant and others filed their verified answer to the bill on November 18, 1916, setting up that they and other defendants of the bill were of Polish nationality and some of them speak only the Polish language and that a large number of them had been employed for a number of years by appellee. The answer goes into the controversy between the appellees and its employees at great length, setting up the low wages received by the employees, the long hours of labor required of them, the unhealthy and dangerous conditions under which they were compelled to work and their attempt to secure relief through organization into a union; also setting up an unlawful combination between appellee and other employers of labor, and various other

279 — 15

unlawful acts of appellee. They further answered that it did not appear from the record that they had unlawfully, willfully and knowingly interfered with the process or order of the court; that the record did not show any lawful cause for said injunctional order or jurisdiction to entertain the rule against respondents; that the petition, as shown on its face, sets forth matters which are almost wholly hearsay; that the court was without jurisdiction to make or enforce the injunctional order or to punish for contempt of court any violation of the same, because said injunctional order, so far as it seeks to enjoin said respondents and punish them for contempt or for the exercise of free speech and free press, is totally void and amounts to a denial of the rights and privileges guaranteed them by the first and fourteenth amendments to the constitution of the United States, and amounts further to a denial of the right of freedom of press and speech guaranteed by section 4 of article 2 of the constitution of Illinois. A motion to discharge the rule, supported by affidavits of the respondents, was also made. In the affidavits and also the answer the respondents denied that they had intimidated or coerced the employees of appellee, injured its business, hindered or interfered with the process of the court, done anything to bring such employees into disgrace or induce anyone to quit the employ of appellee, or had in any way violated the injunction.

On November 25, 1916, there was a hearing, at which it was stipulated between the parties, among other things, that the difficulties existing between the Illinois Malleable Iron Company and its former employees, including most of the members of the Illinois Malleable Iron Workers' Union, of which appellant was president and Kaszubiski was secretary, were at an end, the strike having been abandoned by the strikers and practically all of complainant's employees who were working for complainant prior to said strike were back at work except appellant and Kaszubiski, who have not come back to work and will not be taken back to work

by appellee; that substantially all activities incident to said strike had ceased; that the translation of the article set forth in the petition of August 22, 1916, is accurate and correct. The court found appellant and Kaszubiski guilty of violating the injunction and fined each of them $100 and committed each to jail for ten days. Appellant was allowed and perfected an appeal to this court.

Appellant contends, first, that the injunction was not violated; and second, that the injunction did not restrain him from causing the publication in question to be made, and if it did, the court was without jurisdiction so to do; that the court had no jurisdiction to restrain the publishing of a libel, and that the court having no jurisdiction to grant the injunction, the disobedience thereof was not punishable.

As to the first contention, the publication in question was addressed to the strikers and the tenor of the article is to notify them to attend a meeting. It is not claimed that the employees of appellee who were on a strike, which was being participated in by appellant and others, were under any contract with appellee, and in the absence of such contract they could not lawfully be enjoined from quitting work or striking when they pleased. (*Kemp* v. *Division No. 241,* 255 Ill. 213.) They also had a right to peaceably assemble or hold meetings and discuss matters in which they were interested or which they deemed to be for their benefit. They also had a right to advertise and give notice of such meetings, and the injunction order did not, in fact, prohibit the defendants from striking or holding meetings or giving notice thereof. Taking the article in detail, it states: "We have made up our minds not to pay any attention to the company's chasers, who make all kinds of promises and draw men into the shops on account of these promises, because the scabs are cursing not only themselves but all others, and they claim they will strike again because they are being cheated by the company's foremen and also because they did not receive the wages which the foremen

promised them," etc.  The "we" refers to the committee and those who have signed the article, appellant and Kaszubiski, and can only be construed as a mere statement of their intention and course of conduct.  It also purports to give their reasons for the action: "because the scabs are cursing not only themselves but all others," etc.  Even if the article was false and scurrilous or libelous it was not a disobedience of the injunction order, which prohibited the appellant and others from addressing to any of complainant's employees the word "scab," or words of similar import to hatred, criticism, censure, scorn, disgrace or annoyance, because of their employment by complainant.  This part of the order is somewhat vague except as to the word "scab," but in its strict sense it can only mean addressing such employees as scabs.  They are not prohibited or enjoined from referring or alluding to them as scabs but from addressing them as scabs.  In order to determine whether there was a violation of the injunction it is proper to refer to the bill of complaint as a whole, and the answer thereto, as well as the order itself, for the purpose of determining the matters in issue between the parties in the controversy. The plain inference from the bill and the petition, on which the order was made, and the entire order, is, that the object of that part of the order in question is to prohibit the defendants from calling the employees scabs by word of mouth, which would be using language calculated to provoke a breach of the peace.  An allusion or reference to them as scabs, which is all that can be said of the article, would not have this effect and is not prohibited according to the reasonable meaning of the injunction order.  The term "scab" is defined in Webster's New International Dictionary as follows: "A workman who works for lower wages than or under conditions contrary to those prescribed by the trade union; also one who takes the place of a workman on a strike."  It will thus be seen that the word has a fixed and definite meaning, and it was evidently used in

the article in question in the sense and meaning given to it in the foregoing definition. From the bill and answer, or from the allegations of the bill alone, it appears, in substance, that the employees of complainant had gone on a strike, had formed a union and presented certain demands, with which the complainant had refused to comply and was endeavoring to get others to take the places of the strikers, and that the strikers had been picketing or stationing members of the union in the vicinity of the complainant's plant to induce or compel prospective employees of complainant not to take their places. The main object of the bill and the injunction order was to prevent actual interference by the defendants with the complainant in securing employees. The injunction order, among other things, restrained the defendants from assaulting or intimidating, by threats or otherwise, the employees of complainant, from spying upon them or following the employees of complainant to their homes or other places for the purpose of inducing them to leave the employ of the complainant, and from addressing to any of the employees of complainant the word "scab," etc. While it is alleged in the petition for a rule on appellant and others that the article in question was published in a Polish newspaper which had a wide and general circulation among Polish workmen employed in foundries and factories such as that owned and operated by the appellee, and while the appellant and others were restrained from publishing or sending out circulars or other communications to the employees of complainant calling upon and urging such employees to quit their work, it is not alleged in the petition that the publication in question was sent to any of the employees of complainant or that it was actually brought to their notice. It is merely alleged, on information and belief, that the publication prevented former employees from returning to their said employment. As before stated, the article in question was addressed as a notice to those who were on a strike and not to those who were employees of

the complainant. The portions of the article objected to must be construed the same as if the strikers at a meeting, in discussing the situation among themselves, had made the same statements orally. Conceding that such statements might by innuendo have been slanderous, and, if published, libelous, still, taking the general purport of the bill and its allegations and the allegations in the petition for a rule on appellant most strongly against the pleader, we do not think the article in question was a violation of what appellant, and the others acting with him, had been enjoined from doing. If it were, then any discussion had by the strikers among themselves, or any publication they might make or notice they might give, could be considered a violation of the injunction, for it must be conceded that in a strict sense any action taken by them whatever, such as merely passively staying away from the employ of the complainant, would be to some extent an injury to the complainant and an interference with its business. This applies also to the last paragraph of the article. In that the committee requests the public, in the name of the strikers, to stay away from the struck shops, etc. There is no allegation in the bill or petition or any question of a boycott or conspiracy to injure the appellee by urging prospective customers not to patronize or do business with the appellee or buy its wares, and for that reason the authorities cited by appellee do not apply in this case. There is no request to the employees of appellee to quit their work, and if it could be so construed it must be conceded that, worded as it is, it could be considered but little more than an expression of an opinion which the parties making it would have the right to make and were not enjoined from making. The public would include the strikers as well as the employees of complainant, and for aught that appears its meaning may have been and could be taken as a request to the strikers to stay away from the struck shops in the interest of peace and order. It states what the committee, including appellant, was try-

ing to do, but there was no question about that anyway. The language of the publication must receive a reasonable construction. A mere peaceful request to the public in general to stay away from the shops where there was a strike was no more a violation of this injunction than a refusal of the defendants to return to work would be a violation under the circumstances of the case. In *Christian Hospital* v. *People*, 223 Ill. 244, we held that the acts shown as a violation of an injunction were not sufficient to authorize an attachment for contempt. In *Flannery* v. *People*, 225 Ill. 62, and numerous other cases, we have held that there must be sufficient proof of acts that would constitute a violation of the injunction to render the person enjoined liable in a proceeding for contempt for such alleged violation. In *Dinet* v. *People*, 73 Ill. 183, we held that while a court of chancery has power to commit for contempt in not complying with its decree, it is not proper to imprison for contempt on failure of a party to pay a money decree unless the failure is willful. In that case the defendant in a suit in chancery was attached and ordered committed to jail for a failure to pay the solicitor of complainant a certain sum of money according to a decree of court. By his answer to the petition for attachment he set up the payment of certain sums in compliance with the decree. It was conceded that he had paid the various amounts specified in his answer, but it was claimed that all the payments except a portion had been made in discharge of former orders of the court in the same case, while the respondent claimed they were to be applied in discharge of the decree. It is said on page 185 of the opinion in that case: "It is apparent from the answer, as well as the affidavits filed by the solicitor of appellee, that appellant has honestly placed one construction upon the decree while the solicitor of appellee has placed another and different one upon it. Which of the two constructions may be correct is not a question we are now called upon to decide and upon which we express no opin-

ion. If the construction the solicitors of appellee place upon the decree be the correct one and there remains due thereon $800, still it does not follow that appellant was liable to be imprisoned for contempt of court on default of payment. The liberty of the citizen cannot be taken away upon a pretext so slim as this. * * * From the record before us it does not appear that appellant willfully refused obedience to the decree. If there has been a failure to pay according to the terms of the decree such failure arose from an honest misconception of the true construction to be placed upon it and not from an intent on the part of appellant to set at naught or bid defiance to the decree." In the case at bar the appellant was enjoined from doing many things, and it is not claimed that the injunction order was disobeyed in any respect except in the publication of the notice complained of. It would be putting a strained construction on the publication in question to hold that it was a violation of the injunction order in the respect claimed, as, injuring the business of appellee or intimidating or coercing its employees, and we do not think it can fairly be held to have had such effect.

As the publication in question was not a violation of the injunction order it is not necessary to discuss the other grounds urged for reversal.

For the reasons given, the judgment and order of the circuit court will be reversed.    *Judgment reversed.*

CARTWRIGHT, DUNN and DUNCAN, JJ., dissenting:

The only questions that can be considered in this case are whether the circuit court of Cook county had jurisdiction to order the injunction and whether it was violated by the defendant. If the power to grant the injunction existed, the question whether the court erred or the power was improperly exercised is in no way involved. Jurisdiction is the power to hear and determine a matter in controversy, and the jurisdiction of a court of equity does not

depend upon the correctness of the decision made, and an order made in the exercise of jurisdiction must be obeyed until the order is modified or set aside by the court making it or reversed in a direct proceeding by appeal or on error. (*Leopold* v. *People,* 140 Ill. 552; *Clark* v. *Burke,* 163 id. 334; *O'Brien* v. *People,* 216 id. 354; *Franklin Union* v. *People,* 220 id. 355.) If a court having jurisdiction of the parties and the subject matter should grant an injunction contrary to the established rules governing courts of equity or interfering with what a reviewing court might regard as rights of the defendant, that fact will not excuse a defendant for violating the injunction. (*Christian Hospital* v. *People,* 223 Ill. 244.) That the circuit court had jurisdiction of the parties and the subject matter in this case is beyond question or dispute, and the remaining question whether the injunction was violated is one of fact.

Most of the workmen in manufacturing establishments like that of the complainant, and most of its workmen, were of Polish nationality, and the article alleged to be a violation of the injunction was published in a Polish newspaper having a general circulation among workmen so employed in foundries and factories. The publication was addressed to the strikers of the Illinois Malleable Iron Company, and stated that strikers' meetings were held three times a week at night, at which there were thousands of people, and that the strikers had agreed to stay out on strike until the company should give in to their demands, and concluded with a request to all workmen to attend the meeting on Sunday. These portions of the publication related only to meetings of strikers and their determination to stay out until the complainant had acceded to their demands and were not a violation of the injunction. The article, however, contained this: "We have made up our minds not to pay any attention to the company's chasers, who make all kinds of promises and draw men into the shops on account of these promises, because the scabs are cursing not only themselves

but all others, and they claim they will strike again because they are being cheated by the company's foremen and also because they did not receive the wages which the foremen promised them. These foremen have promised gold apples on trees, and now the scabs are only getting $1.61 per day, and they are required to give up money to the bosses. The committee informs the public, in the name of the strikers, to stay away from the struck shops, as this would harm us in the battle we have been fighting for twelve weeks, because we are not only fighting for those who are striking but also for those who are working there."

The court had jurisdiction to enjoin defendants from in any way interfering with, obstructing or stopping the business of the complainant or its agents, servants or employees, and from publishing or causing to be published or sending out circulars or other communications to employees of complainant calling upon and urging such employees and attempting to persuade them to quit work. The article contained the alleged false statements that the company's chasers made all kinds of promises and drew men into the shops on account of the promises, that those who were in the employ of the complainant were cursing not only themselves but all others because they did not receive the wages the foremen promised them, and that they were only getting $1.61 per day and were required to give up money to the bosses. Those statements were not for strikers, alone, but to prevent workmen generally from engaging in the employment of complainant and being deceived and subjected to the payment of money to the bosses. Not only is that true, but the alleged false statement of facts was followed by a request of the committee to the public, in the name of the strikers, to stay away from the struck shops; and that this was a violation of the injunction there can be no reasonable doubt, because it was intended to deter the public from dealing with the complainant and thereby to injure its business. The fact that the injunction order

should be construed only to prohibit the calling of complainant's employees "scabs" by word of mouth does not excuse or explain away those portions of the publication not addressed to the strikers but to those employed or likely to be employed by the complainant, and the public at large.