MONTGOMERY et al. v. PACIFIC ELECTRIC RY. CO.

(Circuit Court of Appeals, Ninth Circuit.  May 26, 1919.)

No. 3236.

INJUNCTION ☞101(3)—GROUNDS—STRIKES—ORGANIZATION OF LABOR UNIONS.
    Where the contracts of employment between an electric railroad company, in part engaged in transporting war material and munitions workers, and its employés, provided that employés shall not be members of a labor union, and the grand officers of certain railroad brotherhoods attempted to unionize such employés and order a strike, not by recommending or advising or persuading the members to breach their contract in which they were engaged by any peaceful or lawful means, but by threats, opprobrious epithets, and insults, to such an extent that it became necessary for the commanding officer of the United States submarine base in the neighborhood to give proper warning against interference with traffic, and to station naval guards on each car, a bill for an injunction will lie, in view of Act Oct. 15, 1914.

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; Benjamin F. Bledsoe, Judge.

Suit by the Pacific Electric Railway Company against M. E. Montgomery and others for an injunction.  A preliminary injunction was granted, and defendants appeal.  Affirmed.

Herbert D. Gale and D. L. Cobb, both of Los Angeles, Cal., for appellants.

Oscar Lawler, Frank Karr, R. C. Gortner, and E. E. Morris, all of Los Angeles, Cal. (W. R. Millar, of Los Angeles, Cal., of counsel), for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge.  The learned counsel of the appellants says in his brief that the questions involved on this appeal are:

"Whether or not men who labor have the right to organize, and when so organized to collectively leave the service of the employer, for the purpose of improving working conditions, obtaining more pay, and the adjustment and redressing of grievances, and at the same time to induce and persuade others, by lawful means, to refuse to work under such conditions.  Perhaps it would be more to the point to say that the question involved is whether or not labor, in its strife for betterment, is protected by the Clayton Act, every provision of which is violated by the temporary injunction issued by the District Court. * * *

"So plainly are the terms of the restraining order and temporary injunction at variance with the provisions of the Clayton Act and the decisions of our appellate courts that it was apparently conceded before the District Court that the order and injunction would be erroneous, were it not for the decision in the case of Hitchman Coal & Coke Co. v. Mitchell et al., 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1912C, 497, Ann. Cas. 1918B, 461, the form of the order in which case was followed in the present case.  At first glance the action of the District Court in the case at bar, although a death blow to the legitimate aspirations of organized labor, seems, in a measure, justified by the decision in the Hitchman Case; but a closer study of that case fails to bear out that first impression.  The injunction approved by the Supreme Court

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

in the Hitchman Case does the same violence to the provisions of the Clayton Act as does the order at bar, but the Hitchman Case was originally begun in the District Court in October, 1907, while the Clayton Act did not become a law until October 15, 1914. No mention is made of the Clayton Act in either the majority or dissenting opinions in the Hitchman Case, and it seems, therefore, fair to conclude that the Supreme Court decided that case upon the condition of the law existing at the time of its commencement, and not upon the condition existing at the time of the decision, after the passage of the Clayton Act. It seems highly improbable that the Supreme Court intended to nullify an act of Congress, and to substitute its own arbitrary rule for legislative provisions. Certain it is that the provisions of the Clayton Act and the decision in the Hitchman Case cannot be reconciled."

The preliminary injunction here appealed from was preceded by a temporary restraining order, based upon a verified bill, which, in substance, alleges among other things that the complainant, appellee here, is a common carrier of persons and property over its lines of railroad in the counties of Los Angeles, Orange, San Bernardino, and Riverside, and is engaged in interstate commerce, carrying a large number of passengers and handling a large tonnage of freight between points in the state of California and points in other states and territories of the United States and foreign countries, employing upwards of 1,500 men in and about its business, and having a daily gross income of more than $20,000; that the defendants Brotherhood of Railroad Trainmen and Brotherhood of Locomotive Engineers are unincorporated associations, having headquarters at Cleveland, Ohio, the defendants Montgomery and Farquharson, appellants here, being residents of that city, and respectively grand officers of the brotherhoods mentioned, and that the other appellants are the officers and agents at Los Angeles; that during the war the United States established posts and encampments at Arcadia and Ft. McArthur, on the appellee's railroad lines in Los Angeles county, to and from which troops and supplies are being constantly transported, and that the maintenance and operation of the appellee's said railway systems unimpaired is essential; that during the war large shipyards engaged in emergency shipbuilding for the government have been established at Long Beach and San Pedro, on the lines of the appellee, and because of lack of housing facilities at those places it is necessary for upwards of 5,000 workmen, employed at such yards, to travel daily between the cities of Long Beach and Los Angeles and their places of employment; that without the constant, continuous, and adequate service of the complainant for the transportation of such labor to and from such shipyards their activities would be seriously impaired; that at El Segundo, on the complainant's line of railway, there is a large oil refinery, the products of which are required for the operation of steam railroads under the control of the government, and engaged primarily in serving urgent war needs, and that the appellee is being urged by the government to expedite deliveries of such oil from said refinery for the use of such steam roads; that for more than five years prior to, and at the time of the filing of the bill, it had been and was the fixed policy of the appellee to prevent unionizing its employés, and that by the terms and conditions of the contract of employment with each of its employés it

was agreed that the latter should deal directly with its employer, and not through any union or alleged representative body; that the appellants, well knowing such terms of employment, had by false representation, coercion, threats, inducements, and persuasions conducted a campaign among the employés of the appellee for the purpose of creating a union or organization of the latter, taking over all rights of said employés in dealing with their employer and denying to the latter its right to deal with each employé individually; that as a result of such campaign more than 1,200 of the employés of the appellee had been induced to unite themselves with the appellants Montgomery and Farquharson in an agreement to the effect that they would thereafter refuse to deal with the appellee as individuals, and only as an organization, and that upon any refusal of the appellee to accept such new status, or to recognize their said organized form, or to accede to any of their demands, such employés would strike and withdraw from the service of the appellee, and from the performance of the public duties in which, by, through, and with the aid of said employés, appellee had been and was engaged; that the appellants had accomplished the organization and unionizing of more than 1,200 of the appellee's employés, and had procured a vote by which it had been resolved and determined between the appellants and the said employés that unless the appellee would discontinue its said policy of dealing only with its employés directly, and unless it would agree to recognize such organization, and treat and deal with the latter regarding contracts of employment between itself and its individual employés, the said employés would on the 2d day of July, 1918, at 7 o'clock p. m., strike and withdraw from the service of the appellee; that the withdrawal of the said employés, or any considerable number of them, from such service as so threatened, would interfere with and obstruct the performance of the appellee's duties as a common carrier and the transportation of federal troops and supplies for war purposes, and would interfere with the service of appellee as a war utility, and inflict great and irreparable injury; that the appellants in furtherance of their said plan had used coercion, threats, and various persuasions upon the said employés of the appellee, and had by and through their agents, during the 30 days preceding the filing of the bill, interfered with and attempted to interfere with such employés of the appellee for the purpose of organizing and unionizing them, without the consent of the appellee, by representing and causing to be represented to such employés, and to persons who might become such, that they would be likely to suffer some loss or trouble in continuing in or entering the employment of the appellee, because the latter would not recognize the union and was running a nonunion railroad; that the appellants had, during said 30-day period, in aid of their purpose to cause the employés of the appellee to break their contracts of service, enticed them to leave the service of the appellee for the reasons stated, and had entered upon the grounds and premises of the appellee, and into its cars, for the purpose of interfering with and hindering and obstructing the said business of the appellee, and had there and elsewhere by threats, intimidation, and persuasion, and by abusive lan-

guage, attempted to compel and induce such employés to refuse and fail to perform their duties, and to leave the service of the appellee, and to compel persons seeking employment with the appellee not to accept such employment; that all of the said acts of the said appellants were designed and would have the effect of preventing the said employés of the appellee from peaceably or otherwise prosecuting their work.

In response to an order to show cause why a preliminary injunction should not be granted, the matter came on for hearing, at which time there was presented to the court an affidavit of the defendants Montgomery and Farquharson, setting forth, among other things, that in the early part of May, 1918, the employés of the complainant company commenced to organize themselves into unions as divisions and lodges of the brotherhoods that have been mentioned, which work was carried on with the assistance of the brotherhoods and their representatives until suspended by the temporary restraining order of the court issued July 2, 1918, and during which time about 1,300 of such employés had joined the brotherhoods freely and voluntarily and without any threat or coercion; that each and every place mentioned in the complaint as the location of military camps, posts, and shipyards is reached and served by the Southern Pacific Railroad, the officials and superintendents of which road the affiants caused to be notified of the impending strike at least six hours before such strike was called; that during the month of June, 1918, the complainant discharged from its employ more than 30 men, specifically named, who had joined one of the brotherhoods mentioned, in each case refusing to give such employé a hearing, and in respect to many of them saying or intimating that the discharge was because they joined the brotherhood; that on the 25th of June, 1918, the affiants, as representatives of the said 1,300 employés, requested a conference with the president of the complainant company upon the subject, which conference was, on June 27, 1918, refused, and that—

"because of the refusal of plaintiff corporation to recognize and deal with said 1,300 employés through the representatives of their respective organizations, and because of the discharge without just cause or hearing of said mentioned members, and because of other grievances and for the purpose of obtaining such recognition and redress of grievances, there was submitted to said 1,300 members and other operative employés the question of whether or not they would leave in a body the employment of the plaintiff corporation; that between June 29, and July 2, 1918, more than 90 per cent. of said membership voted in favor of leaving the employment of plaintiff in a body, and in accordance with such vote a strike was declared and called, to take effect on July 2, 1918, at 7 o'clock p. m., on which date and hour said 1,300 members withdrew from the service of the plaintiff corporation in a body; that the restraining order issued herein was served on affiants and some of their codefendants at about 9:30 p. m. July 2, 1918, and that by reason of such restraining order, and pursuant to the policy of said brotherhoods, the strike already voted, called, declared, and effective, was ordered to be suspended until the further order of the court; that upon the suspending of said strike a considerable number of said membership reported to the plaintiff for duty, and in a large number of instances were not allowed to return to work; that upon the voting and declaring of said strike, instructions were issued to the membership of said two brotherhoods regarding their conduct during such strike, a

copy of which instructions is hereto attached and marked Exhibit B and made a part of this affidavit.".

The affidavit above referred to also stated that on July 3, 1918, the defendants, as representatives of the 1,300 employés mentioned, offered through a committee appointed by the Governor of California to submit the controversy to the arbitration of any federal board and to abide the award made by such board, which offer was refused by the complainant; that on July 4, 1918, the affiants as such representatives offered to United States Commissioner of Conciliation, C. T. Connell, to submit the controversy to the United States War Labor Board, and to that end delivered to him a letter which is set out in the record.

The refusal by the complainant of the requested conference with it was made by a letter of its president and general manager, Paul Shoup, of June 25, 1918, addressed to the defendants Montgomery and Farquharson as representatives of their respective brotherhoods, in which it was stated by the president and general manager of the complainant as follows:

"No benefit can be derived from conference such as you suggest, you representing the Brotherhood of Locomotive Engineers and Brotherhood of Railway Trainmen, and accompanied by committees representing employés of this company, for the reason that this company does not recognize your organizations, or any other outside organizations, in connection with its relations with its employés, which have been agreeably maintained for many years, and any such conference would therefore merely lead to misunderstandings.

"The inclosed circular, issued to our employés under date of June 5, 1918, expresses the position of the company."

On the hearing and in support of the application for a preliminary injunction the affidavit of Mr. Shoup was introduced, in which it was shown, among other things, that he then was and since 1910 had been the principal executive in charge of operations of the complainant company, during which time he had never declined to meet its employés and discuss with them any subject of mutual interest; that no demand had ever been made upon him for increase in their wages, but that increases had been voluntarily made, without request, from time to time, and in amounts specifically stated in his affidavit; that no controversy over question of hours of employment had been brought to him for consideration, and that the complainant was not then and never had been one of the federal controlled roads, but, on the contrary, was expressly excluded therefrom by act of Congress (Act March 21, 1918, c. 25, 40 Stat. 451, § 1 [Comp. St. 1918, § 3115¾a]), notwithstanding which it had—

"voluntarily raised the wages of its motormen and conductors, all of whom are paid by the hour, to the extent prescribed by the hourly wage basis set forth in Director General's Order No. 27 of May 25, 1918, controlling wages on the lines under federal control, and that in addition, where such employés less than five years in service received additional compensation under the Pacific electric scale through added years of service since 1915, the wage increase had been allowed on the basis of the increased scale, though the same position in work be occupied."

That affidavit proceeds as follows:

"And further that he has by circular told every employé of the company if in doubt to check the increased wages allowed against the scale given in Director General's Order No. 27, to see that the promise that increase should be on that basis is carried out, and that copy of Order No. 27 has been filed at the information bureau of the Pacific Electric Railway Company at Sixth and Main streets accordingly; and with reference to statement made in letter by Messrs. Farquharson and Montgomery, that said promise is not being lived up to by the Pacific Electric Railway Company, alleging certain action by the Council of National Defense having bearing upon the situation, states that he has telegraphed W. V. Hill, Assistant Manager, American Electric Railway Association, War Board, Washington, D. C., as per copy of telegram attached, and received reply from Mr. Hill as per copy of telegram attached, showing that the action referred to had no bearing whatsoever upon the wage scales of electric railways.

"And, further, that the Adamson Act, to which reference has been made in correspondence by Messrs. Farquharson and Montgomery, specifically excludes interurban and street railways.

"And, further, that there is no question as to wages or hours between the employés of the Pacific Electric Railway Company and the company, and that he has not declined to mediate cases of certain employés, numbering 25 or more, dismissed from service in the months of May and June, but, on the contrary, these dismissed employés did not come to him, but instead through channels unknown to him applied to the Secretary of Labor, and on June 22d he received a letter from Charles P. Connell, United States Commissioner of Conciliation (copy attached) in relation to these cases; that Mr. Connell had then to go to San Francisco, and on Thursday afternoon, June 27th, telephoned that he had returned, but would have to leave that night for Salt Lake City, and to wire him of any developments, and that on June 29th he wired Mr. Connell at Salt Lake that he had completed investigations and would be ready to discuss each of them with Mr. Connell on the latter's return, and that Mr. Connell made an appointment by wire from Salt Lake, July 2d, stating he would call on Friday, July 5th, at 10:30 a. m., for such discussion, which he did, and that each and every case was gone over thoroughly at that time, with all of the evidence leading up to the dismissal of each man presented to Mr. Connell for his consideration, and that decision will in a very few days be reached as to the disposition of these cases.

"And, further, that none of these dismissed employés have called upon the president to consider their cases, with the exception of three, who made appointment for 2 o'clock, Thursday, June 27th, and were at that time received by him and their cases discussed, with the conclusion, expressed by Mr. Shoup, to which there was no objection made by the employés, that inasmuch as the cases generally were up for consideration with Mr. C. F. Connell, it would probably be best to take care of all of them through that channel.

"And that the only other question before him at this time, dealing with the relations of the employés to the company, is a request, not from the employés, but from the vice president of the Brotherhood of Railroad Trainmen and vice president of the Brotherhood of Locomotive Engineers, claiming to represent a large number of the motormen and conductors of the company, and demanding under date of July 2d, said demand being presented by letter to the office of affiant shortly after noon of that day, and later delivered to affiant personally about 1:20 p. m., that the organizations of the Brotherhood of Railroad Trainmen and Brotherhood of Locomotive Engineers be recognized, together with certain other demands concerning members of such brotherhoods, and that, if not, the motormen and conductors of the Pacific Electric Railway, in so far as they were members of such organizations, would be withdrawn from the service of the company at 7 o'clock p. m. on that date; and, affiant declining to recognize these organizations, the threat to withdraw these men from the service of the company was carried out, to the extent of the power of the two vice presidents of the organizations named, at that hour."

The record shows that the defendants Montgomery and Farquhar-son, on behalf of their respective brotherhoods, notified Shoup at 1:30 p. m. of July 2, 1918, that, in the event the organization was not recognized, a strike would be called 5½ hours later, which was done. The record also shows that for several weeks preceding the strike the employés of the company were urged to join the unions, and were told, among other things, that they would be "eating dirt off the streets" in the event they failed to do so; that such of the employés as remained at work notwithstanding the strike order were subjected to threats, opprobrious epithets, and insults by members of the associations, and that the senior United States officer in command at San Pedro placed the trains of the complainant company under military guard, issuing the following order:

"To All Persons Concerned:

"1. Because the United States mails must have unimpaired movement;

"(2) In order that the transportation of troops, munitions, and military stores essential to the effective prosecution of the war may not be obstructed;

"(3) To prevent slowing down the building of vessels under construction for the United States Shipping Board at or near Los Angeles Harbor;

"(4) All persons are warned—and hereby cautioned—that any interference or attempt to obstruct the free passage of freight or passenger trains or trolley cars to or from San Pedro and the Outer Harbor, over any rail line, is at their own peril. Naval guards on each car will attend to the enforcement of these instructions; and it is earnestly requested that such guards shall not be hindered or hampered in the execution of duties with which charged.

                                        "H. C. Poundstone,
"Commander U. S. Navy, Commanding Submarine Base and
      Senior Officer Present at San Pedro."

The record also shows that among the "duties of members and committeemen in conduct of strike on Pacific Electric Railway," issued by the defendants Montgomery and Farquharson on behalf of their respective brotherhoods is the following:

"(9) Members of these organizations, employed on neighboring or connecting lines, should be given to understand distinctly that they can continue to perform their usual duties on their own line, but they must not encroach in any way upon the lines of the Pacific Electric, to do work that has not been regarded as a part of their duty prior to the date the strike became effective."

The record further shows that factories engaged in packing sea foods for the United States and allied governments, docks and piers devoted to national use, and a harbor railroad owned by the city of Los Angeles and connecting with the shipyards, the submarine base, and the naval reserve camp at San Pedro, are exclusively served by the line of the complainant company.

The contention of the appellants' counsel that because the act of Congress of October 15, 1914, 38 Stat. 730, c. 323, commonly called the Clayton Act, was not expressly mentioned in either the majority or dissenting opinions of the Supreme Court in the case of Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461, we should hold that the court decided that case "upon the condition of the law existing at the time of its commencement, and not upon the condition existing at the time of the decision," is wholly unsound. The exact re-

verse is manifestly true. That the order here appealed from accords with the decision in the case cited is expressly conceded in the brief for the appellants, where it is declared that—

"the injunction approved by the Supreme Court in the Hitchman Case does the same violence to the provisions of the Clayton Act as does the order at bar."

And again:

"Certain it is that the provisions of the Clayton Act and the decision in the Hitchman Case cannot be reconciled."

Nor is it true that the Supreme Court made in the case cited no reference to the Clayton Act; for, notwithstanding the fact ·that that act was pressed upon its consideration, the court, in the course of its elaborate opinion, expressly declared it "needless to say there is no act of legislation to which defendants may resort for justification."

While it is perfectly true, as is expressly declared in section 6 of that act (Comp. St. § 8835f), "that the labor of a human being is not a commodity or article of commerce," it is equally true that laborers in this country, in whatever field of operation, and whether of head or hand, are governed and protected by the same Constitution and laws that govern and protect the owners of property here. One of the things thus permitted and secured is the right of contract. The latter, freely and fairly made upon sufficient consideration, is inviolable. In the present case the complainant company made non-membership in a union a condition of employment, and to that condition the employés in question agreed. Such was the contract of the parties. Speaking to that point in the Hitchman Case, the Supreme Court said (245 U. S. 250, 251, 38 Sup. Ct. 72, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461):

"That the plaintiff was acting within its lawful rights in employing its men only upon terms of continuing nonmembership in the United Mine Workers of America is not open to question. Plaintiff's repeated costly experiences of strikes and other interferences while attempting to 'run union' were a sufficient explanation of its resolve to run 'nonunion,' if any were needed. But neither explanation nor justification is needed. Whatever may be the advantages of 'collective bargaining,' it is not bargaining at all, in any just sense, unless it is voluntary on both sides. The same liberty which enables men to form unions, and through the union to enter into agreements with employers willing to agree, entitles other men to remain independent of the union, and other employers to agree with them to employ no man who owes any allegiance or obligation to the union. In the latter case, as in the former, the parties are entitled to be protected by the law in the enjoyment of the benefits of any lawful agreement they may make. This court repeatedly has held that the employer is as free to make nonmembership in a union a condition of employment as the workingman is free to join the union, and that this is a part of the constitutional rights of personal liberty and private property, not to be taken away even by legislation, unless through some proper exercise of the paramount police power. Adair v. United States, 208 U. S. 161, 174 [28 Sup. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764]; Coppage v. Kansas, 236 U. S. 1, 14 [35 Sup. Ct. 240, 59 L. Ed. 441, L. R. A. 1915C, 960]. In the present case, needless to say, there is no act of legislation to which defendants ·may resort for justification.

"Plaintiff, having in the exercise of its undoubted rights established a working agreement between it and its employés, with the free assent of the latter, is entitled to be protected in the enjoyment of the resulting status, as

in any other legal right. That the employment was 'at will,' and terminable by either party at any time, is of no consequence.".

With the contract between the complainant company and its employés the appellants Montgomery and Farquharson in their respective capacity, and others acting with them, undertook to interfere, not by "recommending, or advising, or persuading" such employés to break their contract and stop the work in which they were engaged by any peaceful or lawful means, but by threats, opprobrious epithets, and insults, to such an extent that it became necessary for the commanding officer of the United States Submarine Base at San Pedro to give public warning to all persons concerned against any interference, or attempt to interfere, or attempt to obstruct the free passage of freight or passenger trains or trolley cars to or from San Pedro and the Outer Harbor there, and to actually put naval guards on each car to enforce his command. Surely nothing more need be said to show the absurdity of the pretension that the appellants' interference with the existing contract between the complainant company and its employés was not that peaceful, lawful recommending, advising, or persuading the latter to cease work and terminate their employment, permitted by the provisions of the act of Congress of October 15, 1914 (38 Stat. 730). In speaking of similar acts in the Hitchman Mine Case, 245 U. S. 256, 38 Sup. Ct. 74, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461, et seq., the Supreme Court said:

"In any aspect of the matter, it cannot be said that defendants were pursuing their object by lawful means. The question of their intentions—of their bona fides—cannot be ignored. It enters into the question of malice. As Bowen, L. J., justly said, in the Mogul Steamship Case, 23 Q. B. Div. 613: 'Intentionally to do that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another in that other person's property or trade, is actionable if done without just cause or excuse.' And the intentional infliction of such damage upon another, without justification or excuse, is malicious in law. Bitterman v. Louisville & Nashville R. R. Co., 207 U. S. 205, 223 [28 Sup. Ct. 91, 52 L. Ed. 171, 12 Ann. Cas. 693]; Brennan v. United Hatters, 73 N. J. Law, 729 et seq. [65 Atl. 165, 9 L. R. A. (N. S.) 254, 118 Am. St. Rep. 727, 9 Ann. Cas. 698], and cases cited. Of course, in a court of equity, when passing upon the right of injunction, damage threatened, irremediable by action at law, is equivalent to damage done. And we cannot deem the proffered excuse to be a 'just cause or excuse,' where it is based, as in this case, upon an assertion of conflicting rights that are sought to be attained by unfair methods, and for the very purpose of interfering with plaintiff's rights, of which defendants have full notice.

"Another fundamental error in defendants' position consists in the assumption that all measures that may be resorted to are lawful if they are 'peaceable'—that is, if they stop short of physical violence, or coercion through fear of it. In our opinion, any violation of plaintiff's legal rights contrived by defendants for the purpose of inflicting damage, or having that as its necessary effect, is as plainly inhibited by the law as if it involved a breach of the peace. A combination to procure concerted breaches of contract by plaintiff's employés constitutes such a violation. * * *

"It was one thing for plaintiff to find, from time to time, comparatively small numbers of men to take vacant places in a going mine; another and a much more difficult thing to find a complete gang of new men to start up a mine shut down by a strike, when there might be a reasonable apprehension of violence at the hands of the strikers and their sympathizers. The disordered condition of a mining town in time of strike is matter of common knowledge.

It was this kind of intimidation, as well as that resulting from the large organized membership of the union, that defendant sought to exert upon plaintiff, and it renders pertinent what was said by this court in the Gompers Case, 221 U. S. 418, 439 [31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874], immediately following the recognition of the right to form labor unions: 'But the very fact that it is lawful to form these bodies, with multitudes of members, means that they have thereby acquired a vast power, in the presence of which the individual may be helpless. This power, when unlawfully used against one, cannot be met, except by his purchasing peace at the cost of submitting to terms which involve the sacrifice of rights protected by the Constitution, or by standing on such rights and appealing to the preventive powers of a court of equity. When such appeal is made it is the duty of government to protect the one against the many as well as the many against the one."

In the case of Stephens et al. v. Ohio State Telephone Co. (D. C.) 240 Fed. 759, 773, 774, Judge Killits, in discussing the same general subject, said, among other things:

"The right of free speech does not give any one the privilege to force his views upon others, to compel others to listen. The right of others to listen or to decline to listen is as sacred as that of free speech. It is clear that, if one does not desire speech of another, he may as surely have his privacy therefrom as the privacy of his home. It is undeniable that the so-called right of peaceful persuasion may be lawfully exercised only upon those who are willing to listen to the persuasive arguments.

"Again, every man has the right to the pursuit of his lawful business or employment undisturbed, and any act performed with intent to disturb the full and unrestrained exercise of his faculties and wishes in such employment is plainly unlawful.

"Again, he has the right of privacy and freedom from molestation of private persons, hostile or otherwise, at his home; at his lodging, at his place of work; he has the right to walk the streets without annoyance from the unwelcome attentions of others, so long as he is conducting himself in a lawful manner. * * *

"Again, the right of one man to work is as much entitled to respect as the right of another to cease work or to strike.

"Again, the right of an employer to engage whomsoever he chooses is as strong as the right of an employé to refuse to work. * * *

"It is a safe and proper generalization that any action having in it the element of intimidation, or coercion, or abuse, physical or verbal, or of invasion of rights of privacy, when not performed under sanctions of law by those lawfully empowered to enforce the law, is unlawful; every act, of speech, of gesture, or of conduct, which 'any fair-minded man' may reasonably judge to be intended to convey insult, threat, or annoyance to another, or to work assault or abuse upon him, is unlawful. Not a syllable of the Clayton Act, or of any other law, whether of legislation of Congress or of the common law, sanctions any of the incidents we have referred to. They are to be condemned as legally inexcusable; such must be the verdict of 'any fair-minded man'; nothing can be said in justification.

"These propositions are so elemental that, but for the confusion which exists in many minds that a labor controversy affects the commonest rules of life, it would seem a waste of time to state them. The existence of a strike does not make that lawful which would otherwise be unlawful. These personal rights to which we have alluded are, in each instance, precisely those which the striker himself would insist upon were conditions reversed. They are also so plain, and the answers to the questions involving them so certain, that one called upon to enforce the law, if he has but ordinary intelligence, will plainly fail to do his duty when in his presence a fellow citizen suffers an invasion of his rights of this character."

The order appealed from is affirmed.