## TALIAFERRO v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit.   May 21, 1923.)

No. 2095.

1. **Injunction** ☞223(2)—**Owner of property may not use it in violation of injunction.**

That the window, facing a street, in which a placard containing matter in violation of an injunction was displayed, was on property owned by respondent, *held* to constitute no defense to a charge of contempt of court.

2. **Injunction** ☞223(2)—**Violation of strike injunction.**

Respondent, who during a railroad strike, at the request of strikers, displayed in the window of his barber shop, facing a street along which employees of the railroad company passed, going to and from their work, a placard bearing in large letters the words "No Scabs Wanted in Here," *held* in contempt for violation of an order enjoining the strikers and "all persons conspiring or associated with them" from interfering with, annoying, or insulting employees of the company about the premises or on their way to or from their work.

3. **Jury** ☞13(21)—**Right to jury trial under Clayton Act.**

The provision of Clayton Act, § 20 (Comp. St. § 1243d), that no injunction shall be granted in suits arising out of labor disputes, prohibiting any person from doing any act or thing which might lawfully be done in the absence of such dispute, does not limit acts which may be restrained to those which constitute crimes, and thus entitle any person charged with contempt for violation of an injunction granted in such a case to a jury trial under section 22 (Comp. St. § 1245b).

4. **Injunction** ☞216—**Charge of contempt for violation of strike injunction is not charge of conspiracy.**

Though a bill for an injunction against strikers may, and usually does, charge a conspiracy, and such conspiracy may constitute a crime, a charge of contempt for violation of an injunction granted in the case is not a charge of conspiracy, but of doing certain acts specifically forbidden by the injunction, which may or may not constitute crimes.

In Error to the District Court of the United States for the Western District of Virginia, at Lynchburg; Henry Clay McDowell, Judge.

Proceeding for contempt by the United States against L. A. Taliaferro. From the judgment, defendant brings error. Affirmed.

For opinion below, see 290 Fed. 214.

O. B. Harvey, of Clifton Forge, Va., for plaintiff in error.

L. P. Summers, U. S. Atty., of Abingdon, Va., and C. E. Gentry, Asst. U. S. Atty., of Charlottesville, Va., for the United States.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. In July, 1922, the Chesapeake & Ohio Railroad Company filed two bills in the court below. The defendants, some to one bill and the remainder to the other, were about a dozen trade unions of railway shopmen and clerks and a number of persons described as officers or as members of one or another of such unions. The latter were sued as such and also as representatives of the many thousands of their fellow members, who were too numerous to be individually joined. The bills alleged that the controversies arose under the laws of the United States. They charged that the defendants had

struck rather than accept certain rulings of the Federal Railway Labor Board as to wages and working conditions. They said that the law required the plaintiff to continue its service to the public, so that it had no choice other than to fill, if it could, the places of the strikers. They asserted that not only would not the latter work, but they had conspired to prevent the plaintiff from keeping or getting any others to do what had to be done, and that they had planned to accomplish this end by the use of violence, intimidation, threats, and insults directed at those who remained in plaintiff's employ or who might seek to enter it. Various things said to have been already done in furtherance of the common purpose were set forth in considerable detail. Upon these bills were issued restraining orders, which, on the 5th of August, 1922, were replaced by temporary injunctions prohibiting, among many other things, the unions and each and every officer, agent, and member thereof, and the individual defendants, named, and any and all persons conspiring or associating with the defendant unions, or any officer, agent, or member thereof, or with the individually named defendants, from annoying, insulting, or interfering with those in plaintiff's employ or with any seeking to enter it.

The plaintiff in error will be herein referred to as the defendant. He was not a member of any of the unions named, and as he was a barber operating a shop of his own he had no direct material interest in the controversy. Many of his patrons were, however, out on the strike, and he was a warm sympathizer with it, as it goes without saying he had a perfect right to be. His shop in Clifton Forge was not far from one of the entrances to plaintiff's yards or shops and on a street habitually traversed by those working for it. Subsequent to the issue of the injunctions, a couple of the unionists brought to him a placard and asked him to display it. It had the words "No Scabs Wanted in Here," printed in letters sufficiently large to be readable at a distance of from 50 to 100 feet. He hung it up in his window facing the street, so that those using the highway could not avoid seeing it. Some of the United States deputy marshals who were stationed in the town for the purpose of looking after the enforcement of the injunctions came to him and told him that in their judgment a public exhibition of this sign was a breach of the order of the court. They asked him to take it down. He refused to do so. A day or so later he was formally served with a copy of the injunctions. He still insisted that he had a right to display the placard, and he continued to do so, and these proceedings were instituted against him. His demand for a jury trial was refused, and after a hearing before the court, in which the only controverted questions of fact were as to some legally immaterial details not herein referred to, he was found guilty and sentenced to pay a fine. To reverse such judgment he sued out this writ of error.

[1] Some of the contentions, although made by his able counsel with much force and vigor, may be readily disposed of. Among them is the assertion that every one has the absolute right to have within the boundaries of his own property any written or printed matter he chooses, irrespective of its character and of the fact that it is so exhibited that it must necessarily come under the observation of those lawfully

and necessarily using the public streets. It is argued that to punish him for so doing is an attack at once upon the rights of property and upon the freedom of speech. If that were true, the most libelous, obscene, blasphemous, or otherwise offensive posters might be publicly displayed without risk of punishment.

[2] No one questions the right of a court of competent jurisdiction upon a proper showing to enjoin intimidation by insult. Whether the offending epithet is shouted or exhibited makes no legal difference, and it is equally unimportant whether what is said or shown is uttered or displayed within or without the bounds of any particular premises, provided the purpose and necessary effect are that it shall reach the ears or the eyes of those who are where they have a right to be. In the instant case there can be no question that the display of the placard was an insult to every one of plaintiff's employees who refused to join the strike, and there is as little doubt that it was intended as such. In its literal meaning, no more offensive epithet can well be imagined, nor, in view of many tragic incidents, was there any other more likely to alarm those at whom it was directed. The defendant brought himself within the class of persons to whom the injunction applied. He put up the placard at the request of the two members of the union who brought it to him. He thereby associated himself with them in the forbidden intimidation and insult.

[3] He argues that, even if all this be assumed to be true, nevertheless he was entitled to a trial by jury. He says that under the provisions of the Clayton Act (38 Stat. 730) every one charged with a criminal contempt has the right to such a trial, if he asks for it, unless that of which he is accused was committed in the presence of the court or so near thereto as to obstruct the administration of justice, or was in disobedience of an order of court made in a case brought or prosecuted in the name or on behalf of the United States. What was alleged against him obviously does not come within either of these exceptions. His contention, however, altogether ignores the provisions of two controlling sections of the Clayton Act. Section 24 (Comp. St. § 1245d) provides:

"That nothing herein contained shall be construed to relate to contempts committed in the presence of the court, or so near thereto as to obstruct the administration of justice, nor to contempts committed in disobedience of any lawful writ, process, order, rule, decree, or command entered in any suit or action brought or prosecuted in the name of, or on behalf of, the United States, but the same, and *all other cases of contempt not specifically embraced within section twenty-one of this act,* may be punished in conformity to the usages at law and in equity now prevailing." (The italics are ours.)

The only cases of contempt embraced within section 21 are those in which an act or thing alleged to constitute contempt "is also *a criminal offense* under any statute of the United States or under a law of any state in which the act was committed." In this respect the language is so clear as to require no construction. Its plain import is in entire harmony with the legislative history of these sections. In the Sixty-Second Congress, Mr. (now Judge) Clayton, from the Judiciary Committee, reported a bill to amend the Judicial Code by adding five sections, to come in after section 268 and to be designated sections 268a,

268b, 268c, 268d and 268e. The bill then failed to become a law, and in the succeeding Congress, probably to save time, these sections, with some amendments not material to any question now under consideration, were incorporated in the Clayton Act and numbered 21 to 25, inclusive. In reporting them to the House of the Sixty-Third Congress, which enacted them into law, Mr. Clayton contented himself with repeating what he had said to its predecessor. He explained that section 268 of the Judicial Code (Comp. St. § 1245), formerly section 725 of the Revised Statutes, remained unchanged. Under the proposed new section 268a—that is, section 21 of the Clayton Act—he stated that:

"In such cases of contempt * * * as constitute a criminal offence under any statute of the United States or at common law, the proceedings against the accused shall be 'as hereinafter provided'; that is, in the subsequent sections of the bill." House Report No. 613, 62d Congress, Second Session.

The report of the minority of the committee adversely commented upon the fact that the contempts which constituted criminal offenses were triable by jury, and in those which did not the right to such trial was not given. Minority Report, House Report No. 613, Part 2, 62d Congress, Second Session.

The learned counsel for the defendant urges, however, that section 20 (Comp. St. § 1243d) expressly forbids the prohibition by injunction of any act or thing which might lawfully be done in the absence of a dispute between employer and employees, and he argues that everything is lawful, within the meaning of the word so used, unless it is a criminal offense, and that therefore the only acts which can be enjoined in connection with strikes are those which do constitute criminal offenses against the law, either of the state or of the nation. If this were the proper construction of the act, there would have been no occasion for the difference of opinion between the majority and the minority of the Judiciary Committee as evidenced in the reports above mentioned, for the limitation of the right of jury trial to those contempts in which the thing charged constituted a criminal offense would have been altogether meaningless, at least so far as labor disputes were concerned. It is quite clear, however, that the assumption that unlawful and criminal are synonymous terms is unsound. In the Hitchman Coal Co. Case, 245 U. S. 257, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461, the Supreme Court characterizes as "fundamental" the error of assuming "that all measures that may be resorted to are lawful if they are peaceable; that is, if they stop short of physical violence or coercion through fear of it"—adding that in its opinion "any violation of plaintiff's legal rights contrived by the defendants for the purpose of inflicting damage or having that as its necessary effect, is as plainly inhibited by law as if it involved a breach of the peace." Judge Killits in Stephens v. Ohio State Tel. Co. (D. C.) 240 Fed. 759, at page 774 says:

"It is a safe and proper generalization that any action having in it the element of intimidation or coercion, or abuse, physical or verbal, or of invasion of rights of privacy, when not performed under sanctions of law by those lawfully empowered to enforce the law, is unlawful; every act, of speech, of gesture or of conduct which 'any fair-minded man' may reasonably

judge to be intended to convey insult, threat, or annoyance to another, or to work assault or abuse upon him, is unlawful."

The above statement was quoted with approval by the Circuit Court of Appeals of the Ninth Circuit in Montgomery v. Pacific Electric Railway Co., 258 Fed. 382, 169 C. C. A. 398. Judge Trieber in Kroger Grocery Co. v. Retail Clerks' Association (D. C.) 250 Fed. 890, said it was a mistake to suppose that by the provisions of the Clayton Act any act or acts which were unlawful at the time the act was passed were legalized. He specially refers to the use by some of the defendants in that case of the epithet "scabs." In Truax v. Corrigan, 257 U. S. 327, 42 Sup. Ct. 124, 66 L. Ed. 254, acts which were certainly not criminal, had they been committed by an individual, were characterized by the Supreme Court as illegal without doubt, and in American Foundries v. Tri City Council, 257 U. S. 203, 42 Sup. Ct. 72, 66 L. Ed. 189, it was declared that section 20 introduces "no new principle into the equity jurisprudence of the federal courts. It is merely declaratory of what was the best practice always."

[4] Defendant's counsel says that this is after all beside the mark, because his client did not put himself under the terms of the injunction, unless he associated himself with the conspiracy alleged in the bill, and that, if he be accused of so doing, he is charged with an offense criminal at common law and in Virginia. Crump v. Commonwealth, 84 Va. 946, 6 S. E. 620, 10 Am. St. Rep. 895; Harris v. Commonwealth, 113 Va. 746, 73 S. E. 561, 38 L. R. A. (N. S.) 458, Ann. Cas. 1913E, 597. In this reasoning he has, in our view, misinterpreted the purpose and effect of the statutory provision upon which he relies. To give it the construction he puts upon it would be to assume that Congress had made an idle distinction. In labor disputes a number of the workers always act together. If the employer obtains an injunction, he has necessarily charged that their concert is for an unlawful end, or at least that it contemplates the use of unlawful means; that is to say, he alleges that they have conspired together. If defendant's zealous contention is correct, it follows that in such controversies everything legally forbiddable by injunction is necessarily criminal, and that there cannot be a punishable contempt which is not. The trouble with this argument is that the legislative proceedings which led up to the Clayton Act demonstrate that Congress did not think so. What it had in mind was plain enough. In the course of a strike some one may be assaulted, or some property may be willfully injured or destroyed. If an injunction has been issued, such acts are usually breaches of it, and they, of course, are always criminal offenses. There had been much complaint that a jury trial, to which an accused was entitled if the thing charged against him was a crime, would be denied him if it was called a contempt. Congress felt that substantial rights should not depend upon what appeared to many to be nothing but a play upon words.

Moreover, when the contempt charged was also a definite criminal offense, it was easy to make adequate provision for its trial by jury. What were the necessary legal elements of the crime in question had been defined in countless cases. The evidence required to prove it had

been many times passed upon. Most of the other possible incidents of a trial for the thing charged had received judicial consideration. The rules were fixed and generally known. When the accused was charged with assault, manslaughter, murder, malicious destruction of property, arson, or some other definite crime, the issues upon which the jury would be called upon to pass were simple. If defendant's theory of the law were accepted, the problems presented would be infinitely more complicated. Many injunctions have issued in the long course of the struggle between some of the West Virginia coal operators and the coal miners' union. In a number of these cases, the plaintiffs have alleged with a good deal of particularity a conspiracy said to have been originally entered into a quarter of a century ago between some of their competitors in other states and the miners' union to coerce them to do what they did not want to. Such conspiracy it is asserted has continued ever since. Is it possible that, whenever some obscure individual is charged with having done something forbidden by one of those writs, the government must go into proof of this 25 year old conspiracy, and that the defendant, very probably a poor man, will through weeks of time have to defend himself against a charge of which he knows nothing, and much of which it is quite conceivable he would never be able to understand? Yet, if the contention of the counsel for the present defendant is correct, that is precisely what must happen whenever in any of these cases a charge of contempt is to be passed upon. It will make no difference in this respect whether the accused demands a jury trial or does not.

Upon the assumptions here contended for, if the offense charged against him is the conspiracy, that must be proved, irrespective of who the triers of fact may be. In truth, however, in proceedings to punish for willful disobedience of the court's order, the offense charged is not the conspiracy. The court, when it issues its preliminary injunction, judicially finds that there is sufficient prima facie evidence of the fact of such conspiracy and of the irreparable damage to the plaintiff, if certain things are allowed to be done until final hearing can be had. It does not at that stage of the litigation say that the parties must cease conspiring. It simply forbids them doing certain acts which are causing harm to the plaintiff. It is familiar law that one who defies such prohibition cannot be heard to say, "I may not be punished until the conspiracy is proved." He must obey the order of the court so long as it is in force. To hold otherwise would be to say that no preliminary injunction is binding on any one. Moreover, to rule that such injunctions prohibit conspiring, and not the doing of specified things, would be to defeat one of the principal purposes of the Clayton Act. It wished to make sure that no one could be punished for disobeying an injunction unless what he did was forbidden by it, in terms so plain that he who runs may read.

The suggestion that the rules applicable to the original defendants, either those named in the bills or those represented by them, do not govern the defendant, is without substance. It is true that, as he was not one of the original defendants, it was incumbent upon the government to show that he had associated himself with them; that is to

say, if there was a conspiracy to which they were parties, he had united in it, but that is not trying him for the conspiracy. It is merely putting him in the same class with the first defendants. Any one of them, charged with doing what he did, would, like him, have been tried for the forbidden thing he did, and, if convicted, it would have been for that he would have been punished and not for conspiracy. What was charged against defendant was not a crime under the law of the state or nation, and in consequence, he was not entitled to a jury trial. Patton v. United States, 288 Fed. 812, decided by this court March 31, 1923.

Affirmed.