MILK WAGON DRIVERS UNION OF CHICAGO, LOCAL 753, ET AL. *v.* MEADOWMOOR DAIRIES, INC.

No. 1. Argued December 13, 16, 1940.—Decided February 10, 1941.

Mr. *Abraham W. Brussell,* with whom *Messrs. Joseph A. Padway* and *David A. Riskind* were on the brief, for petitioners. *Mr. Myron D. Alexander* entered an appearance.

*Messrs. Donald N. Schaffer* and *Roy Massena* for respondent.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The supreme court of Illinois sustained an injunction against the Milk Wagon Drivers Union over the latter's claim that it involved an infringement of the freedom of speech guaranteed by the Fourteenth Amendment. Since this ruling raised a question intrinsically important, as well as affecting the scope of *Thornhill* v. *Alabama,* 310 U. S. 88, and *Carlson* v. *California,* 310 U. S. 106, we brought the case here. 310 U. S. 655.

The "vendor system" for distributing milk in Chicago gave rise to the dispute. Under that system, which was fully analyzed in *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products,* 311 U. S. 91, milk is sold by the dairy companies to vendors operating their own trucks who resell to retailers. These vendors departed from the working standards theretofore achieved by the Union for its members as dairy employees. The Union, in order to compel observance of the established standards, took action against dairies using the vendor system. The present respondent, Meadowmoor Dairies, Inc., brought suit against the Union and its officials to stop interference with the distribution of its products. A preliminary injunction restraining all union conduct, violent and peaceful, promptly issued, and the case was referred to a master for report. Besides peaceful picketing of the stores handling Meadowmoor's products, the master found that there had been violence on a considerable scale. Witnesses testified to more than fifty instances of window-smashing; explosive bombs caused substantial injury to the plants of Meadowmoor and another dairy using the vendor system and to five stores; stench bombs were dropped in five stores; three trucks of vendors were wrecked, seriously injuring one driver, and another was driven into a river; a store was set on fire and in large

measure ruined; two trucks of vendors were burned; a storekeeper and a truck driver were severely beaten; workers at a dairy which, like Meadowmoor, used the vendor system were held with guns and severely beaten about the head while being told "to join the union"; carloads of men followed vendors' trucks, threatened the drivers, and in one instance shot at the truck and driver. In more than a dozen of these occurrences, involving window-smashing, bombings, burnings, the wrecking of trucks, shootings, and beatings, there was testimony to identify the wrongdoers as union men.[1] In the light of his findings, the master recommended that all picketing, and not merely violent acts, should be enjoined. The trial court, however, accepted the recommendations only as to acts of violence and permitted peaceful picketing. The reversal of this ruling by the supreme court, 371 Ill. 377; 21 N. E. 2d 308, directing a permanent injunction as recommended by the master, is now before us.

The question which thus emerges is whether a state can choose to authorize its courts to enjoin acts of picketing in themselves peaceful when they are enmeshed with contemporaneously violent conduct which is concededly outlawed. The Constitution is invoked to deny Illinois the power to authorize its courts to prevent the continuance and recurrence of flagrant violence, found after an extended litigation to have occurred under specific circumstances, by the terms of a decree familiar in such cases. Such a decree, arising out of a particular controversy and adjusted to it, raises totally different constitutional problems from those that would be presented by an abstract statute with an overhanging and undefined threat to free utterance. To assimilate the two is

---

[1] It would needlessly encumber the reports to quote in detail the evidence thus summarized. The curious may turn to the record in the case.

to deny to the states their historic freedom to deal with controversies through the concreteness of individual litigation rather than through the abstractions of a general law.

The starting point is *Thornhill's* case. That case invoked the constitutional protection of free speech on behalf of a relatively modern means for "publicizing, without annoyance or threat of any kind, the facts of a labor dispute." 310 U. S. 100. The whole series of cases defining the scope of free speech under the Fourteenth Amendment are facets of the same principle in that they all safeguard modes appropriate for assuring the right to utterance in different situations. Peaceful picketing is the workingman's means of communication.

It must never be forgotten, however, that the Bill of Rights was the child of the Enlightenment. Back of the guarantee of free speech lay faith in the power of an appeal to reason by all the peaceful means for gaining access to the mind. It was in order to avert force and explosions due to restrictions upon rational modes of communication that the guarantee of free speech was given a generous scope. But utterance in a context of violence can lose its significance as an appeal to reason and become part of an instrument of force. Such utterance was not meant to be sheltered by the Constitution.

Still it is of prime importance that no constitutional freedom, least of all the guarantees of the Bill of Rights, be defeated by insubstantial findings of fact screening reality. That is why this Court has the ultimate power to search the records in the state courts where a claim of constitutionality is effectively made. And so the right of free speech cannot be denied by drawing from a trivial rough incident or a moment of animal exuberance the conclusion that otherwise peaceful picketing has the taint of force.

In this case the master found "intimidation of the customers of the plaintiff's vendors by the commission of the acts of violence," and the supreme court justified its decision because picketing, "in connection with or following a series of assaults or destruction of property, could not help but have the effect of intimidating the persons in front of whose premises such picketing occurred and of causing them to believe that non-compliance would possibly be followed by acts of an unlawful character." It is not for us to make an independent valuation of the testimony before the master. We have not only his findings but his findings authenticated by the State of Illinois speaking through her supreme court. We can reject such a determination only if we can say that it is so without warrant as to be a palpable evasion of the constitutional guarantee here invoked. The place to resolve conflicts in the testimony and in its interpretation was in the Illinois courts and not here. To substitute our judgment for that of the state court is to transcend the limits of our authority. And to do so in the name of the Fourteenth Amendment in a matter peculiarly touching the local policy of a state regarding violence tends to discredit the great immunities of the Bill of Rights. No one will doubt that Illinois can protect its storekeepers from being coerced by fear of window-smashings or burnings or bombings. And acts which in isolation are peaceful may be part of a coercive thrust when entangled with acts of violence. The picketing in this case was set in a background of violence. In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future picketing might be wholly peaceful. So the supreme court of Illinois found. We cannot say that such a finding so contradicted experience as to warrant our rejection. Nor can we say that it was written into the Fourteenth Amendment that a state

through its courts cannot base protection against future coercion on an inference of the continuing threat of past misconduct. Cf. *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436.

These acts of violence are neither episodic nor isolated. Judges need not be so innocent of the actualities of such an industrial conflict as this record discloses as to find in the Constitution a denial of the right of Illinois to conclude that the use of force on such a scale was not the conduct of a few irresponsible outsiders. The Fourteenth Amendment still leaves the state ample discretion in dealing with manifestations of force in the settlement of industrial conflicts. And in exercising its power a state is not to be treated as though the technicalities of the laws of agency were written into the Constitution. Certainly a state is not confined by the Constitution to narrower limits in fashioning remedies for dealing with industrial disputes than the scope of discretion open to the National Labor Relations Board. It is true of a union as of an employer that it may be responsible for acts which it has not expressly authorized or which might not be attributable to it on strict application of the rules of *respondeat superior. International Association of Machinists* v. *Labor Board,* 311 U. S. 72, 80; *Heinz Co.* v. *Labor Board,* 311 U. S. 514. To deny to a state the right to a judgment which the National Labor Relations Board has been allowed to make in cognate situations, would indeed be distorting the Fourteenth Amendment with restrictions upon state power which it is not our business to impose. A state may withdraw the injunction from labor controversies but no less certainly the Fourteenth Amendment does not make unconstitutional the use of the injunction as a means of restricting violence. We find nothing in the Fourteenth Amendment that prevents a state if it so chooses from placing confidence in a chancellor's decree and compels it to rely exclusively on a policeman's club.

We have already adverted to the generous scope that must be given to the guarantee of free speech. Especially is this attitude to be observed where, as in labor controversies, the feelings of even the most detached minds may become engaged and a show of violence may make still further demands on calm judgment. It is therefore relevant to remind that the power to deny what otherwise would be lawful picketing derives from the power of the states to prevent future coercion. Right to free speech in the future cannot be forfeited because of dissociated acts of past violence. Nor may a state enjoin peaceful picketing merely because it may provoke violence in others. *Near* v. *Minnesota,* 283 U. S. 697, 721–22; *Cantwell* v. *Connecticut,* 310 U. S. 296. Inasmuch as the injunction was based on findings made in 1937, this decision is no bar to resort to the state court for a modification of the terms of the injunction should that court find that the passage of time has deprived the picketing of its coercive influence. In the exceptional cases warranting restraint upon normally free conduct, the restraint ought to be defined by clear and guarded language. According to the best practice, a judge himself should draw the specific terms of such restraint and not rely on drafts submitted by the parties. But we do not have revisory power over state practice, provided such practice is not used to evade constitutional guarantees. See *Fox River Co.* v. *Railroad Comm'n,* 274 U. S. 651, 655; *Long Sault Development Co.* v. *Call,* 242 U. S. 272, 277. We are here concerned with power and not with the wisdom of its exercise. We merely hold that in the circumstances of the record before us the injunction authorized by the supreme court of Illinois does not transgress its constitutional power. That other states have chosen a different path in such a situation indicates differences of social view in a domain in which states are free to shape their local policy. Com-

pare *Busch Jewelry Co.* v. *United Retail Employees'
Union*, 281 N. Y. 150; 22 N. E. 2d 320, and *Baillis* v.
*Fuchs*, 283 N. Y. 133; 27 N. E. 2d 812.

To maintain the balance of our federal system, insofar
as it is committed to our care, demands at once zealous
regard for the guarantees of the Bill of Rights and due
recognition of the powers belonging to the states. Such
an adjustment requires austere judgment, and a precise
summary of the result may help to avoid misconstruc-
tion.

(1) We do not qualify the *Thornhill* and *Carlson* de-
cisions. We reaffirm them. They involved statutes
baldly forbidding all picketing near an employer's place of
business. Entanglement with violence was expressly out
of those cases. The statutes had to be dealt with on
their face, and therefore we struck them down. Such an
unlimited ban on free communication declared as the law
of a state by a state court enjoys no greater protection
here. *Cantwell* v. *Connecticut*, 310 U. S. 296; *American
Federation of Labor* v. *Swing, post*, p. 321. But just as a
state through its legislature may deal with specific cir-
cumstances menacing the peace by an appropriately
drawn act, *Thornhill* v. *Alabama, supra*, so the law of a
state may be fitted to a concrete situation through the
authority given by the state to its courts. This is pre-
cisely the kind of situation which the *Thornhill* opinion
excluded from its scope. "We are not now concerned
with picketing *en masse* or otherwise conducted which
might occasion such imminent and aggravated danger
. . . as to justify a statute narrowly drawn to cover the
precise situation giving rise to the danger." 310 U. S.
105.[2]   We would not strike down a statute which author-

---

[2] See also this statement in the *Carlson* opinion: "The power and
duty of the State to take adequate steps to preserve the peace and
protect the privacy, the lives, and the property of its residents
cannot be doubted." 310 U. S. 113.

ized the courts of Illinois to prohibit picketing when they should find that violence had given to the picketing a coercive effect whereby it would operate destructively as force and intimidation. Such a situation is presented by this record. It distorts the meaning of things to generalize the terms of an injunction derived from and directed towards violent misconduct as though it were an abstract prohibition of all picketing wholly unrelated to the violence involved.

(2) The exercise of the state's power which we are sustaining is the very antithesis of a ban on all discussion in Chicago of a matter of public importance. Of course we would not sustain such a ban. The injunction is confined to conduct near stores dealing in respondent's milk, and it deals with this narrow area precisely because the coercive conduct affected it. An injunction so adjusted to a particular situation is in accord with the settled practice of equity, sanctioned by such guardians of civil liberty as Mr. Justice Cardozo. Compare *Nann* v. *Raimist,* 255 N. Y. 307; 174 N. E. 690. Such an injunction must be read in the context of its circumstances. Nor ought state action be held unconstitutional by interpreting the law of the state as though, to use a phrase of Mr. Justice Holmes, one were fired with a zeal to pervert. If an appropriate injunction were put to abnormal uses in its enforcement, so that encroachments were made on free discussion outside the limits of violence, as for instance discussion through newspapers or on the radio, the doors of this Court are always open.

(3) The injunction which we sustain is "permanent" only for the temporary period for which it may last. It is justified only by the violence that induced it and only so long as it counteracts a continuing intimidation. Familiar equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer warranted. Here again, the state courts have not

the last say.   They must act in subordination to the duty of this Court to enforce constitutional liberties even when denied through spurious findings of fact in a state court. Compare *Chambers* v. *Florida,* 309 U. S. 227.   Since the union did not urge that the coercive effect had disappeared either before us or, apparently, before the state court, that question is not now here.

(4) A final word.   Freedom of speech and freedom of the press cannot be too often invoked as basic to our scheme of society.   But these liberties will not be advanced or even maintained by denying to the states with all their resources, including the instrumentality of their courts, the power to deal with coercion due to extensive violence.   If the people of Illinois desire to withdraw the use of the injunction in labor controversies, the democratic process for legislative reform is at their disposal. On the other hand, if they choose to leave their courts with the power which they have historically exercised, within the circumscribed limits which this opinion defines, and we deny them that instrument of government, that power has been taken from them permanently.   Just because these industrial conflicts raise anxious difficulties, it is most important for us not to intrude into the realm of policy-making by reading our own notions into the Constitution.

*Affirmed.*

MR. JUSTICE BLACK, dissenting.

In my belief the opinion just announced gives approval to an injunction which seriously infringes upon the constitutional rights of freedom of speech and the press. To such a result I cannot agree.

Before detailing the reasons for my disagreement, some preliminary observations will doubtless aid in clarifying the subsidiary issues.   The right of the Illinois courts to enjoin violence is not denied in this case.   And I agree

that nothing in the Federal Constitution deprives them of that right. But it is claimed that Illinois—through its courts—has here sanctioned an injunction so sweeping in its terms as to deny to petitioners and others their constitutional rights freely to express their views on matters of public concern. And this is the single federal question we must decide. In their brief, petitioners state that they "have never and do not at the present time in any way condone or justify any violence by any member of the defendant union. Petitioners did not object to the issuance of an injunction restraining acts of violence. There is no contention made that the act of the Chancellor in granting such an injunction was erroneous." [1] "Ethically, morally and legally," the petitioning union disclaims and condemns the acts of violence. And the master who conducted the hearings in the case specifically found that the union officials had instructed their pickets to refrain from violence.[2] The record shows that

[1] The record shows that in a petition to determine damages, filed even before the trial court entered its final order, the petitioners said: "The court was informed at that time [when the original effort was made to secure dissolution of the temporary injunction] that the defendants and each of them, were wholly in accord with the injunction prohibiting violence of any kind. . . ." R. 265.

[2] "That the instructions given to such persons so patrolling or picketing by the officers of the defendant Union have been to do same peacefully and not to interfere with the ordinary course of business in said stores, except to patrol back and forth with said placards." R. 230–231.

Meadowmoor had originally sought an injunction in the federal district court. The federal master's report, introduced in this case as an exhibit for Meadowmoor, states: "I further find that the instructions given to such persons patrolling or peacefully picketing by the officers of the defendant association have been not to speak or carry on any conversation with any other person or persons in front of the said premises, nor to interfere with the orderly course of business of the said stores, except to patrol back and forth with the said placard." R. 165.

the officials gave these instructions (which were obeyed), not only because they realized that resort to force and violence would be reprehensible and indefensible, but also because they recognized that such lawless conduct injures a labor union far more than it helps it. Aside from this, it cannot be doubted that attempts to persuade others by the application of physical force and violence as a substitute for persuasion by reason and peaceable argument is contrary to the first principles of our government. Nor can it be questioned that it is a prime function of courts to provide law enforcement means intended both to punish such illegal conduct and to protect against it. But this great responsibility is entrusted to courts not merely to determine the guilt or innocence of defendants, but to do so in such manner that those brought before them may enjoy a trial in which all their constitutional rights are safeguarded— including the constitutional guaranties of freedom of speech and the press.

In determining whether the injunction does deprive petitioners of their constitutional liberties, we cannot and should not lose sight of the nature and importance of the particular liberties that are at stake. And in reaching my conclusion I view the guaranties of the First Amendment[3] as the foundation upon which our governmental structure rests and without which it could not continue to endure as conceived and planned.[4] Free-

---

[3] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." It is now too well settled to require citation that by the Fourteenth Amendment the guaranties of the First Amendment are protected against abridgment by the states.

[4] Thomas Jefferson, the great strategist of the campaign to bring about the adoption of the Bill of Rights, a campaign which he began even before the Constitution was adopted, said as to one of

dom to speak and write about public questions is as important to the life of our government as is the heart to the human body. In fact, this privilege is the heart of our government. If that heart be weakened, the result is debilitation; if it be stilled, the result is death.

In addition, I deem it essential to our federal system that the states should be left wholly free to govern within the ambit of their powers. Their deliberate governmental actions should not lightly be declared beyond their powers. For us to shear them of power not denied to them by the Federal Constitution would amount to judicial usurpation. But this Court has long since— and I think properly—committed itself to the doctrine that a state cannot, through any agency, either wholly remove, or partially whittle away, the vital individual freedoms guaranteed by the First Amendment. And in solemnly adjudicating the validity of state action touching these cherished privileges we cannot look merely at the surface of things, for were we to do so these constitutional guaranties would become barren and sterile. We must look beneath the surface, and must carefully examine each step in proceedings which lead a court to enjoin peaceful discussion. In this case, in order to determine whether or not the state has overstepped constitutional boundaries, I find it necessary to give consideration to a number of factors, including the nature of the proceedings; the definiteness, indefiniteness and constitutional validity of the basic law upon which the injunction is said to rest; the findings and the evidence; the definiteness, indefiniteness and scope of the language

---

the guaranties of the First Amendment: "The basis of our governments being the opinion of the people, the very first object should be to keep that right; and were it left to me to decide whether we should have a government without newspapers, or newspapers without a government, I should not hesitate a moment to prefer the latter."

of the injunction itself; and the alleged imminence of the threatened dangers said to justify the admitted abridgment of free speech. My conclusion that the injunction as directed by the Supreme Court of Illinois invades the constitutional guaranties of freedom of speech and the press rests on my belief that these propositions are correct: (1) the subjects banned from public discussion by the injunction are matters of public concern, touching which the Constitution guarantees the right of freedom of expression; (2) the law of Illinois, as declared by its Supreme Court, makes illegal the exercise of constitutionally guaranteed privileges, and is an inadequate basis upon which to defend this abridgment of free speech; (3) the rule upon which the injunction is supported here and which this Court now declares to be the Illinois law is not the rule upon which the Illinois Supreme Court relied; (4) the rule announced here as supporting the right of a state to abridge freedom of expression is so general and sweeping in its implications that it opens up broad possibilities for invasion of these constitutional rights; (5) in any event, the injunction here approved is too broad and sweeping in its terms to find justification under the rule announced by the Illinois court, and even though under other circumstances such an injunction would be permissible under the rule now announced by this Court, still in this case such an injunction is supported neither by the findings nor the evidence.

*First.* What petitioners were enjoined from discussing were matters of public concern "within that area of free discussion that is guaranteed by the Constitution." [5] The controversy here was not a mere private quarrel between individuals, involving their interests alone. This injunction dealt with two conflicting methods of milk distribution—a matter of interest not only to Chi-

[5] *Thornhill* v. *Alabama*, 310 U. S. 88, 102. Cf. *New Negro Alliance* v. *Sanitary Grocery Co.*, 303 U. S. 552.

cago's 148 dairies, their employees and their hundreds of retail outlets, but to the mass of milk consumers in the Chicago area as well. The older method of distribution, by which members of the petitioning union are employed, distributes a major part of the milk supply by door-to-door deliveries to the ultimate consumer. The rival method of distribution, in which respondent engages, takes two forms: the dairies using this method sell their milk to "cut-rate" stores, either directly or through the medium of so-called "vendors." The cut-rate stores sell milk at a retail price two cents a quart less than that fixed by the dairies employing union labor. According to the court below, the system of cut-rate distribution, resulting in loss of business by the union dairies, loss of employment by the union drivers, and loss of a thousand members by the union itself, is at the root of a long-standing controversy. Not only this: the situation here is an intimate part of the larger problem of milk production and distribution throughout the country, and, indeed, of the still larger problem of all sorts of cut-rate distribution. There are thus involved trade practices which are not confined to Chicago alone—trade practices in which there is known to be a distinct cleavage in public thought throughout the nation.

*Second.* In essence, the Illinois Supreme Court held that it was illegal for a labor union to publicize the fact of its belief that a cut-rate business system was injurious to the union and to the public, since such publicity necessarily discouraged that system's prospective purchasers. This conclusion of the court was based on the following reasoning: The Fourteenth Amendment and the Due Process Clause of the Illinois Constitution, considered (in some way not made clear) in connection with the unwritten "common law," assure respondent the unqualified right to do business free from all unjustifiable inter-

ference; publication and peaceful argument intended to persuade respondent's customers that its methods of doing business were such that they should not buy the dairy's products were therefore illegal interference; the union's purpose to better working conditions of its members was no justification for its peaceful discussion of the controversy. Neither the presence nor the absence of violence was considered by the court to be a necessary element in its conclusion. All this was but to say that in this controversy peaceful criticism of the "vendor system" was illegal because it might injure respondent's business by discouraging trade. But Illinois cannot, without nullifying constitutional guaranties, make it illegal to marshal public opinion against these general business practices. An agreement so to marshal public opinion is protected by the Constitution, even though called a "common law" conspiracy or a "common law" tort. Despite invidious names, it is still nothing more than an attempt to persuade people that they should look with favor upon one side of a public controversy.

*Third.* But this Court sustains the injunction on the ground that the Illinois Supreme Court "justified its decision" by reference to violence, thereby indicating that that characteristic was made an essential element of the rule from which the injunction sprang. I do not so read that court's opinion, and apparently the Illinois Supreme Court itself does not so read it. That this is true is evidenced by that court's language in a later decision where, speaking of the present case, it said: "In that case there was some evidence of violence, but . . . the issue of violence was not the turning point of the decision." [9] And even if violence were unintentionally included or incidentally referred to in the course of formulating a

---

[9] *Ellingsen* v. *Milk Wagon Drivers' Union,* 2 Labor Cases 567, 568; 377 Ill. 76.

rule touching the right of free speech, such an unintentional inclusion or incidental reference is too uncertain a support upon which to rest a deprivation of this vital privilege.

*Fourth.* There is no state statute upon which either this Court or the Supreme Court of Illinois could have relied in sustaining the injunction.[7] Assuming that the Supreme Court of Illinois did declare the rule which this Court has adopted, in doing so it has not marked the limits of the rule with that clarity which should be a prerequisite to an abridgment of free speech. Nor do I believe that this Court, even if it should, has supplied that essential definiteness. What we are here dealing with is an injunction, and not a "statute narrowly drawn" to cover a situation threatening "imminent and aggravated danger."[8] Speaking of a similar abridgment of constitutional rights where there was no guiding legislative act, we said in *Cantwell* v. *Connecticut*: "Violation of an Act exhibiting such a legislative judgment and narrowly drawn to prevent the supposed evil, would pose a question differing from that we must here answer. Such a declaration of the state's policy would weigh heavily in any challenge of the law as infringing constitutional limitations. Here, however, the judgment is based on a common law concept of the most general and undefined nature. . . . Here we have a situation analogous to a conviction under a statute sweeping in a great variety

---

[7] Illinois has an anti-injunction statute relating to matters involving labor disputes (Ill. Rev. Stat. 1939, chap. 48, § 2 (a)). The Supreme Court said that this statute was modeled on the federal Clayton Act (38 Stat. 738, 29 U. S. C. § 52). But the court held that the facts here did not constitute the type of "labor dispute" to which the act applied. 371 Ill. at 383–386; 21 N. E. 2d 308. Cf. *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products*, 311 U. S. 91.

[8] *Thornhill* v. *Alabama*, 310 U. S. 88, 105.

of conduct under a general and indefinite characterization, and leaving to the executive and judicial branches too wide a discretion in its application." [9]   In the present case, the prohibition against the dissemination of information through peaceful picketing was but one of the many restraints imposed by the sweeping injunction.   As to this one single element of the prohibitions a number of statements appear in the rule now formulated.   On the one hand it is said that "dissociated acts of past violence" are not enough to forfeit the right of free speech.   On the other hand a "background of violence" appears to be sufficient.   Nor are any more definite standards or guides to be found in such clauses as "context of violence"; "entanglement with violence"; "coercive effect"; "taint of force"; and "coercive thrust."   It is my apprehension that a rule embodying such broad generalizations opens up new possibilities for invasion of the rights guaranteed by the First Amendment.

*Fifth.* In my opinion the sweeping injunction here approved is justified by neither of the rules, and is not supported by the record.

For our purposes, in order to reach a proper conclusion as to just what is the sweep of the injunction, we must necessarily turn to the complaint, the answer, the evidence, the findings, and the decision and judgment of the Illinois courts.   And whether the injunction will restrain the exercise of constitutional rights depends upon the effect it will have upon the minds of those whose freedom of expression might be abridged by its mandate. This effect in turn depends upon the language appearing upon the face of the injunction.   By that language we must judge it.   For this injunction does not run merely against lawyers who might give it a legalistic interpretation, but against laymen as well.   Our question then

---

[9] 310 U. S. 296, 307–308.

becomes: To what extent will the layman who might wish to write about or discuss the prohibited subjects feel that he cannot do so without subjecting himself to the possibility of a jail sentence under a summary punishment for contempt? This injunction, like a criminal statute, prohibits conduct under fear of punishment. There is every reason why we should look at the injunction as we would a statute, and if upon its face it abridges the constitutional guaranties of freedom of expression, it should be stricken down. This is especially true because we must deal only with the federal question presented, which is whether petitioners have been denied their rights under the First Amendment. The injunction, like a statute, stands as an overhanging threat of future punishment. The law of Illinois has been declared by its highest court in such manner as to infringe upon constitutional guaranties. And by this injunction that law as actually applied abridges freedom of expression. Looking at the injunction, we find that under pain of future punishment by a trial judge all of the members of the petitioning union (about six thousand) are prohibited "From interfering, hindering or otherwise discouraging or diverting, or attempting to interfere with, hinder, discourage or divert persons desirous of or contemplating purchasing milk and cream or other products aforesaid, including the use of said signs, banners or placards, and walking up and down in front of said stores as aforesaid, and further preventing the deliveries to said stores of other articles which said stores sell through retail; [or] From threatening in any manner to do the foregoing acts; . . ." It surely cannot be doubted that an act of the Illinois legislature, couched in this sweeping language, would be held invalid on its face.[10] For this

---

[10] Cf. *Thornhill* v. *Alabama,* 310 U. S. 88; *Carlson* v. *California,* 310 U. S. 106. With a change of but one word, a passage from the *Carlson* case is directly applicable to the present case: "The sweep-

language is capable of being construed to mean that none of those enjoined can, without subjecting themselves to summary punishment, speak, write or publish anything anywhere or at any time which the Illinois court—acting without a jury in the exercise of its broad power to punish for contempt [11]—might conclude would result in

ing and inexact terms of the [injunction] disclose the threat to freedom of speech inherent in its existence. It cannot be thought to differ in any material respect from the statute held void in *Thornhill's* case." 310 U. S. at 112.

And a comparison of the language of the statutes held invalid in the *Thornhill* and *Carlson* cases with that of the injunction here sustained is very revealing:

| Thornhill statute: | Meadowmoor injunction: | Carlson statute: |
|---|---|---|
| "go[ing] near to or loiter[ing] about the premises or place of business . . .; influencing . . . persons not to trade . . .; picket[ing] the works or place of business . . ." | "walking up and down in front of said stores . . .; discouraging . . . persons . . . contemplating purchasing . . .; interfering, hindering, or . . . divert[ing] . . . persons desirous of . . . purchasing . . .; us[ing] signs, banners or placards . . . in front of said stores . . ." | "loiter[ing] in front of . . . any place of business . . .; influencing . . . any person to refrain from purchasing . . .; intimidating, threatening or coercing . . . any person . . .; display[ing] any banner . . . badge or sign in front of . . . any place of business . . ." |

[11] In Illinois, the power to punish summarily for contempt is said to be a broad "inherent" power of courts, "independent of statutory provisions" and of "constitutional grant." *Schmidt* v. *Cooper*, 274 Ill. 243, 250; 113 N. E. 641; *People* v. *Peters*, 305 Ill. 223, 226–227; 137 N. E. 118. And where a trial judge has ruled that conduct is or is not contempt, the appellate court will not interfere unless the trial judge's findings are "manifestly against the weight of the evidence" or "clearly and palpably contrary" to it. See *Oehler* v. *Levy*, 256 Ill. 178, 183; 99 N. E. 912; *Boyden* v. *Boyden*, 162 Ill. App. 77, 83; *American Cigar Co.* v. *Berger*, 221 Ill. App. 339, 341 (violation of injunction against picketing); *id.*, 221 Ill. App. 332; *Schmook* v. *Fane*, 301 Ill. App. 626; 22 N. E. 2d 450 (violation of injunction against picketing). And where the trial court has determined the extent of

discouraging people from buying milk products of the complaining dairy. And more than that—if the language is so construed, those enjoined can be sent to jail if they even threaten to write, speak, or publish in such way as to discourage prospective milk purchasers. I find not even slight justification for an interpretation of this injunction so as to confine its prohibitions to conduct near stores dealing in respondent's milk. Neither the language of the injunction nor that of the complaint which sought the injunction indicates such a limitation. Mr. Justice Cardozo approved no such injunction as this in *Nann* v. *Raimist,* 255 N. Y. 307; 174 N. E. 690. In fact, he ordered expunged from the injunction those prohibitions which impaired "defendant's indubitable right to win converts over to its fold by recourse to peaceable persuasion, and to induce them by like methods to renounce allegiance to its rival."

But the injunction approved here does not stop at closing the mouths of the members of the petitioning union. It brings within its all-embracing sweep the spoken or written words of any other person "who may . . . now . . . or hereafter . . . agree or arrange with them . . . " So, if a newspaper should "agree or arrange" with all or some of those here enjoined to publish their side of the controversy, thereby necessarily tending to "discourage" the sale of cut-rate milk, the publishers might likewise be subject to punishment for contempt.[12] Ordinarily the scope of the decree is co-

---

the punishment to be inflicted, ."courts of appellate jurisdiction will not interfere with the exercise of such discretion except for its abuse." *Ash-Madden-Rae Co.* v. *International Ladies Garment Workers' Union,* 290 Ill. 301, 306; 125 N. E. 258 (violation of injunction against picketing).

[12] Cf. *Cohen* v. *United States,* 295 F. 633; *Taliaferro* v. *United States,* 290 F. 906, 214. Cohen, "the owner, editor, and publisher" of a newspaper, was convicted of contempt by the District Court under an injunction restraining "strikers and their sympathizers."

extensive with the allegations of the bill, its supporting affidavits or findings of fact. In other words, the acts enjoined are the acts alleged in the bill as the basis for complaint.[13] And the complaint on which the injunction here rests specifically charged that the union had caused "announcement to be made by the public press of the City of Chicago, for the purpose of intimidating the said storekeepers and causing them to cease purchasing the milk sold by said plaintiffs through fear and terror of the renewal of said conspiracy, . . ." Specific reference was made to these newspaper stories as appearing in the Chicago *Tribune* and the Chicago *Evening American*. Proof was made of these publications. And the injunction of the trial judge, set aside by the Supreme Court of Illinois, specifically saved to petitioners—as in effect did Justice Cardozo in the New York case—their right to publicize their cause by means of "advertisement or communication." But the injunction sustained here is to be issued as prayed for in the bill of complaint. And since the acts enjoined are the acts alleged in the bill as the basis for complaint, newspaper publications of the type referred to in the complaint are literally enjoined. Since the literal language of the injunction, read in the light of the complaint, the supporting evidence, and the language of the trial judge's saving

---

The Circuit Court of Appeals reversed. Taliaferro, a barber in no way connected with a railroad strike, was convicted of contempt under an injunction restraining union members and those "associated with them." Taliaferro's offense consisted in placing in his window a sign saying "No scabs wanted in here." The Circuit Court of Appeals affirmed the conviction. And see *Illinois Malleable Iron Co.* v. *Michalek,* 279 Ill. 221; 116 N. E. 714.

[13] Cf. Frankfurter and Greene, The Labor Injunction, p. 112, citing *Hotel & Railroad News Co.* v. *Clark,* 243 Mass. 317; 137 N. E. 534. And see *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229, 262; *Illinois Malleable Iron Co.* v. *Michalek,* 279 Ill. 221, 228; 116 N. E. 714.

clause—stricken down by action sustained here—thus unconstitutionally abridges the rights of freedom of speech and press, we cannot escape our responsibility by the simple expedient of declaring that those who might be sent to jail for violating the plain language of the injunction might eventually obtain relief by appeal to this Court. To uphold vague and undefined terminologies in dragnet clauses directly and exclusively aimed at restraining freedom of discussion upon the theory that we might later acquit those convicted for violation of such terminology amounts in my judgment to sanctioning a prior censorship of views. No matter how the decree might eventually be construed, its language, viewed in the light of the whole proceedings, stands like an abstract statute with an overhanging and undefined threat to freedom of speech and the press. All this, of course, is true only as to those who argue on the side of the opponents of cut-rate distribution. No such undefined threat hangs over those who "agree or arrange" with the advocates of the cut-rate system to encourage their method of distribution.

Nor is it any answer to say that the injunction would not be carried out in all its potential rigor. It was to obtain just these potentialities that respondent, already having secured from the trial court an injunction against acts of violence, appealed to the Illinois Supreme Court in order to secure an injunction broad enough to prevent petitioners' peaceable comunication to the public of their side of the controversy. It is too much to expect that after complete approval of this abridgment of public discussion by the Supreme Court of Illinois, and after the opinion just announced, the injunction will not be enforced as written. So written, there could hardly be provided a more certain method wholly and completely to prevent all public discussion antagonistic to respondent's method of selling milk. And it is claimed by the

members of the petitioning union that foreclosure of opportunity for public discussion amounts to a death sentence for the method of business which gives them employment. The decision here thus permits state control by injunction as a substitute for competitive discussion of a controversy of particular interest to the union, and a matter of public concern as well.

A careful study of the entire record in this case convinces me that neither the findings nor the evidence, even viewed in the light most favorable to respondent, showed such imminent, clear and present danger [14] as to justify an abridgment of the rights of freedom of speech and the press. The picketing, which did not begin until September, 1934, has at all times been peaceful. Usually one picket, and never more than two, walked along the street bearing a sign. These pickets never impeded traffic either on the sidewalks or in the street, nor did they disturb any passersby or customers. In fact, it is stipulated in the record that pickets "made no threats against any of these storekeepers, but peacefully picketed these stores. They made no attempt to stop any customers or to stop delivery except insofar as their situation and the signs they bore had that tendency." There was no evidence to connect them with any kind or type of violence at any time or place. As was found by the master, this was in accordance with the instruction which was given to them by the union officials.[15] There is no

---

[14] *Cantwell* v. *Connecticut,* 310 U. S. 296, 308; *Carlson* v. *California,* 310 U. S. 106, 113; *Herndon* v. *Lowry,* 301 U. S. 242, 258; *Schenck* v. *United States,* 249 U. S. 47, 52. And see the concurring opinion of Justices Holmes and Brandeis in *Whitney* v. *California,* 274 U. S. 357, 373, and the dissenting opinions of the same Justices in *Gitlow* v. *New York,* 268 U. S. 652, 672–673; *Pierce* v. *United States,* 252 U. S. 239, 255; *Schaefer* v. *United States,* 251 U. S. 466, 482; and *Abrams* v. *United States,* 250 U. S. 616, 627.

[15] See note 2, *supra.*

evidence and no finding that dissemination of information by pickets stimulated anyone else to commit any act of violence.

There was evidence that violence occurred—some committed by identified persons and some by unidentified persons. A strike of farmers supplying most of Chicago's milk took place in the early part of January, 1934. This strike practically stopped the inflow of milk into the city. As a result, the union drivers were ordered not to report for work on January 8 and 9, at the height of the strike. It was during this period that the larger part of the major acts of violence occurred. According to the complaint and the evidence, seven trucks were seized or damaged on the 8th and 9th of January, 1934, and one on the 6th. These are the only trucks that were ever seized or damaged, according to both the complaint and the evidence, and it was in connection with these seizures that the injuries to truck drivers, the shootings, and the threats referred to in this Court's opinion took place. Undoubtedly, some of the members of the union participated in this violence, as is shown by the fact that several were arrested, criminal prosecutions were instituted, and the cases later settled with the approval of the trial judge. It was eight months after this before any picketing occurred; four years afterwards before the trial judge granted an injunction, limited to violence alone; five years before the Supreme Court of Illinois directed a more stringent injunction against peaceful persuasion; and seven years before this Court sustained the injunction.

During the period of the farmers' strike in 1934, and in the immediately succeeding months, five stores were either bombed or burned. Three union members were tried, convicted and sentenced to the penitentiary for arson in connection with one of these burnings. All of this violence took place many months before any of the

picketing occurred. In addition to these 1934 acts of
violence, the evidence showed that one stench bomb was
thrown into a store in 1935, one in 1936, and two in 1937.
The identity of the persons throwing these stench bombs
was not shown.

The only other violence alleged or testified to was the
breaking of windows in cut-rate stores. Most of the
testimony as to these acts of violence was given by re-
spondent's vendors, and was extremely indefinite. The
master made no findings as to specific acts of violence,
nor as to the dates of their occurrence. Viewing the evi-
dence in the light most favorable to respondent, how-
ever, all of the acts of violence as to which any testimony
was offered are gathered in the accompanying footnote.[16]

---

[16]

|  | Windows Broken | Trucks Seized | Stores Bombed or Burned | Miscel-laneous |
|---|---|---|---|---|
| 1934 | 34 | 8 | 5 | 4 |
| 1935 | 5 | 0 | 1 | 0 |
| 1936 | 7 | 0 | 1 | 0 |
| 1937 | 7 | 0 | 2 | 0 |
|  | 53 | 8 | 9 | 4 |

Petitioners offered evidence that three men, with no union connec-
tions whatsoever, confessed to and were convicted of the smashing
of windows in twenty-four cut-rate milk stores in 1934, pursuant to
an insurance racket. The master struck this evidence from the rec-
ord, on respondent's motion.

In addition to the acts of violence enumerated in the foregoing
table, there was evidence of six acts of violence in 1932, among them
the bombing of Meadowmoor's plant referred to in the opinion. Peti-
tioners offered evidence to show that at that time respondent was
gangster-dominated, and that the gangsters in question had sought
to obtain control of the union, but this evidence was excluded.

The opinion also refers to the beating of workers at a cut-rate
dairy other than Meadowmoor. The master did not mention this
incident in his findings, but it is referred to in the evidence, and from
that source it appears that those beaten and told "to join the union"

It is on the basis of my study of the entire record that I rest my conclusion that the forfeiture of the right to free speech effected by the injunction is not warranted. In reaching this conclusion, I fully recognize that the union members guilty of violence were subject to punishment in accordance with the principles of due process of law. And some of them have in fact been prosecuted and convicted. Punishment of lawless conduct is in accord with the necessities of government and is essential to the peace and tranquillity of society. But it is going a long way to say that because of the acts of these few men, six thousand other members of their union can be denied the right to express their opinion to the extent accomplished by the sweeping injunction here sustained.[17] Even those convicted of crime are not in this country punished by having their freedom of expression curtailed except under prison rules and regulations, and then only for the duration of their sentence.

No one doubts that Illinois can protect its storekeepers from being coerced by fear of damage to their property from window-smashing, or burnings or bombings. And to that end Illinois is free to use all its vast resources and powers, nor should this Court stand in the way so long as Illinois does not take away from its people rights guaranteed to them by the Constitution of the United States. When clear and present danger of riot, disorder,

were inside workers not eligible for membership in the petitioning union.

[17] It is said that the decision here leaves the Illinois courts free to consider modification of the injunction. But whether modification is permissible or will in fact take place depends on Illinois law and Illinois courts. A statute can be modified or even repealed by subsequent legislation, but if upon its face it infringes the right of free speech it is invalid. And a court's injunction, making a law for a particular case, can stand no higher than a legislature's act, generally applicable to all the people.

interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order appears, the power of the Illinois courts to prevent or punish is obvious.[18]   Furthermore, this is true because a state has the power to adopt laws of general application to provide that the streets shall be used for the purpose for which they primarily exist, and because the preservation of peace and order is one of the first duties of government. But in a series of cases we have held that local laws ostensibly passed pursuant to this admittedly possessed general power could not be enforced in such a way as to amount to a prior censorship on freedom of expression, or to abridge that freedom as to those rightfully and lawfully on the streets.[19]   Illinois, like all the other states of the Union, is part of a national democratic system the continued existence of which depends upon the right of free discussion of public affairs—a right whose denial to some leads in the direction of its eventual denial to all.   I am of opinion that the court's injunction strikes directly at the heart of our government, and that deprivation of these essential liberties cannot be reconciled with the rights guaranteed to the people of this Nation by their Constitution.

MR. JUSTICE DOUGLAS concurs in this opinion.

MR. JUSTICE REED, dissenting.

My conclusion is that the injunction ordered by the Supreme Court of Illinois violates the constitutional rights of the Milk Wagon Drivers Union of Chicago, its officers and members.   The Court reaches a contrary

---

[18] *Cantwell* v. *Connecticut,* 310 U. S. 296, 308.

[19] *Lovell* v. *City of Griffin,* 303 U. S. 444; *Schneider* v. *State,* 308 U. S. 147; *Thornhill* v. *Alabama,* 310 U. S. 88; *Carlson* v. *California,* 310 U. S. 106; *Cantwell* v. *Connecticut,* 310 U. S. 296.

result on the ground that a state may "authorize its courts to enjoin acts of picketing in themselves peaceful when they are enmeshed with contemporaneously violent conduct which is concededly outlawed." Since this controversy, by virtue of the Court's opinion, centers around picketing as a phase of free speech rather than around the more general topic of freedom of expression, I desire to state for myself the reasons which lead me to the conviction that the judgment should be reversed. A principle is thus involved, as well as a dispute over the scope of a court injunction.

The record shows inexcusable acts of violence, committed at least in part by members of the union. For such conduct, the offenders are subject to punishment by the criminal laws of Illinois. The future conduct of the rioters is also subject to state control by injunction, exercised within the limits of the Constitution. The burden and the duty of maintaining law and order fall primarily on Illinois. Whether it chooses an injunction against violence alone or against violence and peaceful picketing, it must be assumed that its commands will be obeyed. It is a postulate of reasoned thinking that the judicial decrees will be faithfully carried out. This question then emerges. Is the right to picket peacefully an employer's place of business lost for any period of future time by past acts of violence? The trial court, in this very case, while prohibiting all violence, permitted by its injunction the continuance of efforts by the union, either singly or in concert, to peaceably persuade others by picketing or other lawful means to support its contentions.

Where nothing further appears, it is agreed that peaceful picketing, since it is an exercise of freedom of speech, may not be prohibited by injunction or by statute. *Thornhill* v. *Alabama*, 310 U. S. 88; *American Federation of Labor* v. *Swing, post,* p. 321. It is equally clear that

the right to picket is not absolute. It may, if actually necessary, be limited, let us say, to two or three individuals at a time and their manner of expressing their views may be reasonably restricted to an orderly presentation. *Thornhill* v. *Alabama, supra,* 105. From the standpoint of the state, industrial controversy may not overstep the bounds of an appeal to reason and sympathy.

The Court now determines that where there is a background of violence, and inferentially, I think it must be admitted, that where there is a reasonable fear of violence, the freedom of speech which is secured to all persons by the First and Fourteenth Amendments to the Constitution may be withdrawn. It finds its justification in the authority of Illinois to "protect its storekeepers from being coerced by fear of window-smashings or burnings or bombings." The momentum of fear from past violence, it is thought, would reach over into the peaceful picketing of the future. This goes much farther than the injunction approved by this Court in *Hague* v. *C. I. O.,* 307 U. S. 496, 517, which forbade interferences with the liberty of free speech but left to the guardians of public peace the right "to enforce law and order by lawful search and seizure or by arrest and production before a judicial officer." This authority of Illinois to protect its storekeepers must be exercised, however, within the framework of the Constitution. If Illinois were not a member of the United States, but a sovereign without exterior political or social obligations, it would be in a position to use whatever means it or its courts might decide would best put an end to labor disturbances. As a state of the Union it is subject to the restraints of the Constitution. If the fear engendered by past. misconduct coerces storekeepers during peaceful picketing, the remedy lies in the maintenance of order, not in denial of free speech. Constitutional guarantees against oppression are of value only when needed to challenge attacks.

320

The right to picket peacefully in industrial disputes is a recognized means for the marshaling of public opinion on the side of the worker. There is no finding that violence was planned or encouraged by the union. To deny this right of peaceful picketing to thousands because of the violence of a few means the cutting off of one of the constitutionally protected ways in which orderly adjustments of economic disputes are brought about. I cannot see that the constitutional problem is "totally different" because raised by a court decree rather than a statute. Constitutional guarantees are just as effective for the individual as they are for the general public. The principle contended for by petitioners is the right to tell their side of the story by peaceful picketing despite a state court's view that such picketing may project fear from past violence into the future. In the last analysis we must ask ourselves whether this protection against assumed fear of future coercion flowing from past violence is sufficient to justify the suspension of the constitutional guarantee of free speech. If picketing is prohibited here, the right maintained by *Thornhill* v. *Alabama* collapses on the first attack.

This nation relies upon public discussion as one of the indispensable means to attain correct solutions of problems of social welfare. Curtailment of free speech limits this open discussion. Our whole history teaches that adjustment of social relations through reason is possible while free speech is maintained. This Court has the solemn duty of determining when acts of legislation or decrees of courts infringe that right guaranteed to all citizens. Free speech may be absolutely prohibited only under the most pressing national emergencies. Those emergencies must be of the kind that justify the suspension of the writ of habeas corpus or the suppression of the right of trial by jury. Nothing approaching this situation exists in this record and, in my judgment, the

action of the Supreme Court of Illinois in prohibiting peaceful picketing violates the constitutional rights of these petitioners.