# ORMEROD, et al v. TYPOGRAPHICAL UNION, et al.

Circuit Court, Dade County.

March 14, 1951.

July 30, 1951.

Loftin, Anderson, Scott, McCarthy & Preston, Miami, for plaintiffs.

Joseph Pardo, Miami, for International Typographical Union.

J. F. Gordon and L. G. Egert, both of Miami, for Miami Typographical Union Local 430.

VINCENT C. GIBLIN, Circuit Judge.

Opinion, March 14: The strike of the composing room employees of the Miami Herald began on December 23, 1948. It has been followed by a series of incidents and events which clearly and unmistakably evidence a plan of the unions of which the striking employees are members to intimidate and coerce the employees who have supplanted the strikers and to interfere with their legal right to work.

Picketing of the Herald plant immediately followed the walk-out.

Within a few days after the strike began two of the union pickets, who had known Ruth Kerns, a linotype operator, in Washington, followed her as she emerged from the Herald plant and without any encouragement or invitation from her accompanied her to a nearby cafe where she had lunch. They spent the time during which they were with Mrs. Kerns in an effort to persuade her to leave her employment. One of the pickets met her every night as she left the plant for almost a week and pleaded with her to abandon her job.

In February, 1949 Mildred Loudermilk, a linotype operator, left the plant for lunch. During her absence her linotype machine was operated by a man. On her return her machine was jammed. She found iron filings in it. A day or two later the man who had operated the machine during Mrs. Loudermilk's lunch period left the employ of the Herald. Before he left, however, he endeavored to persuade Mrs. Loudermilk to abandon her employment, telling her that if she did not, "something awful is going to happen to you; you will have your head bashed in."

In the early morning hours of February 23, 1949 Spencer G. Porcher, a composing room employee, was attacked and assaulted by three men in a parking lot near the Herald plant. The men made no attempt to rob him. In the February 23, 1949 issue of the Miami Union Printer (published by members of Miami Typographical Union #430) there appeared a photograph of Porcher above which there appeared in bold type

"Know This Man." In the article beneath the photograph Porcher was characterized as a "rat". It is significant that the publication and circulation of the pamphlet and the attack on Porcher were on the same day.

On the night of February 25, 1949 John H. Cornett, the composing room foreman of the Herald, was approached by two men near the Herald building. One of the men attacked Cornett and during the struggle kicked him in the groin. No effort was made to rob Cornett.

At midnight on a night in July, 1949 E. D. Bratton, a compositor, was attacked by two men a short distance from the Herald plant. He was hit with a blackjack and knocked unconscious. No attempt was made to rob him.

In June, 1949 Ruth Kerns was attacked and struck by a girl companion of one of the pickets as she was returning to work. Endeavoring to escape and enter the Herald building she found her entrance blocked by four pickets. Her assailant again grabbed her and she was forced to run across the street to a restaurant for safety. It was not until other employees came to her aid that she was able to re-enter the building and resume her work.

About midnight on a night in June, 1949 Raymond Hyde, a linotype operator, was attacked and beaten near the Herald plant. The assailant verbally abused him during the encounter, calling him a "s.... o.... a b...." and a "rat". No attempt was made to rob him.

In August, 1949 Mildred Loudermilk was verbally assaulted by pickets who called her a "bitch".

During the month of August, 1949 the tires on the automobile of W. T. Anderson, Jr., a linotype operator, were twice slashed.

In September, 1949 E. D. Bratton was attacked for the second time. The attack was at night by two men and Bratton was again severely beaten. No attempt was made to rob him.

During September or October, 1949 John H. Cornett's car was damaged while parked in front of his home. One tire was slashed and molding torn from the side of the automobile.

In November, 1949 the four tires on the automobile of Samuel D. Meier, the head machinist in the Herald composing room, were slashed while he was attending church services.

During the same month all four tires of the automobile of

Raymond Hyde were slashed and acid was thrown on the car to damage the paint. Hyde's car was parked at home and was damaged during the night.

In December, 1949 the tires on Samuel D. Meier's automobile were again slashed while he was attending church services.

On December 21, 1949 a dye bomb was thrown at the home of Meier and paint or dye was splattered on the exterior wall of his residence.

About midnight on March 4, 1950 an attempt was made to dynamite an apartment occupied by Charles Anderson, Phillip Anderson and Amos Powell, three Herald employees. The loud explosion frightened the occupants of the apartment and inflicted some damage to the building. Fortunately, however, no physical injury was suffered by any of the occupants.

In March, 1950 a dye bomb was thrown through one of the windows of the home of Charles J. Watters, a composing room foreman. The window was broken and the dye or paint splashed into the bedroom and on the bed of Watters' two-year-old daughter. This incident, of course, considerably frightened Mrs. Watters and the child.

On the night of March 14, 1950 the home of Fred L. Breece was dynamited. Breece is not an employee of the Herald but at the time of the dynamiting the guest house in the rear of Breece's property was occupied by Oscar Holstetter, a Herald employee. Holstetter's mail box was on the chimney of the main house and the street address number of the guest house was on the chimney. The dynamite bomb was placed in a vent just below Holstetter's house number. The perpetrators of this outrage evidently thought that Holstetter was an occupant of the main house. Breece's house was greatly damaged. It cost him $3,000 to effect its repair.

In March, 1950 damage was done to the automobile of H. D. Williams, a composing room employee.

In April, 1950 John H. Cornett's automobile was set on fire while it was in a parking lot near the Herald plant.

On September 19, 1950 W. T. Anderson, Sr., was insulted in a public place by one of the pickets. He was followed from the place by the picket and assaulted. The assailant was convicted in the city court of assault and battery.

In October, 1950 Mrs. Lina Williams, an employee in the classified department of the Herald, who had rented her home

during June, July, August and September, 1950 to W. T. Anderson, Jr., was followed and beaten by a man as she was returning to her home, which she had reoccupied. The attack was at eleven o'clock in the evening. No attempt was made to rob her. As a result of the attack Mrs. Williams was incapacitated for two weeks.

On the night of February 5, 1951 another dye bomb was thrown against the home of Charles J. Watters, the composing room foreman who had suffered a similar experience in March, 1950.

On the same night a dye bomb damaged the home of Tom S. Davidson. Davidson, who is not an employee of the Herald and not connected with it in any way, had purchased the home in October, 1950 from Samuel D. Meier, the head machinist of the Herald. Meier had lived in the home from December, 1949 to October 26, 1950. At the time the dye bomb was thrown it was evidently thought that Meier was still an occupant of the house.

On February 8, 1951 a picket was seen taking the license number of the automobile of W. A. Sadler, a Herald printer.

On the night of February 9, 1951 a jar of paint was thrown against the home of Charles J. Watters and another against his automobile.

On February 16, 1951 (only six days before the institution of this suit) a dye bomb was thrown against the home of George R. Shade, a Herald printer. His married daughter was living with him at the time and was expecting the birth of a child. The incident seriously affected her.

During the strike the pickets have repeatedly and consistently carried sandwich-signs on which the names of various Herald employees have been printed. On each of such signs the address of the named employee has been shown; and on each of the signs the employee whose name and address was given has been designated as a "rat" or a "scab."

The publication referred to, the Miami Union Printer, has several times during the strike published the photographs and addresses of various non-union Herald employees.

An anonymous threatening communication was received through the mail by Edna Trumbull, a proof reader.

"Obituary notices" were sent by the local union to William B. Sandlin, the mechanical superintendent of the Herald.

There have been several times when Herald employees who

were driving home at night were followed in automobiles by unidentified persons.

There can be no doubt that the picketing of the newspaper plant in which the non-union plaintiff employees are working has been set in a background of continued and persistent threats, molestation, interference, intimidation, coercion, violence and mischief to which the non-union employees have been subjected. The picketing, except on a few occasions, has been peaceful; but it cannot be divorced from the evident general plan with which it is enmeshed.

It is urged that many, if not most, of the incidents and events to which attention has been drawn are not directly traceable to the defendant unions or their members. Must this court be so blind to the actualities of life as to conclude, because of lack of direct evidence, that such incidents and events were the activities of irresponsible outsiders? Certainly not. The circumstances are such that no conclusion can be reached other than that the defendant unions and their members are responsible.

The injunctive protection sought will be granted. This court will do all within its power to end the illegal activities which have given rise to this litigation. The right to organize and to strike are necessary and legitimate economic weapons in the hands of labor; and peaceful and lawful picketing is likewise a potent and valid force. Picketing, however, loses the protection of constitutional guaranty when it steps over the line from persuasion to coercion.

The court has been guided, in applying the law to the facts here involved, by the opinions and decisions of the Supreme Court of the United States in Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U.S. 287, 85 L. ed. 836 (decided 1941), and Building Service Employees International Union v. Gazzam, 339 U.S. 532, 94 L. ed. 1045 (decided 1950); and by the opinions and decisions of the Supreme Court of Florida in Moore v. City Dry Cleaners & Laundry, 41 So. 2d 865 (decided 1949) and Local Union No. 519 v. Robertson, 44 So. 2d 899 (decided 1950). All questions presented in the instant case have been answered in the cited cases. An appropriate interlocutory injunctive order will be issued.

Opinion and final decree, July 30: The interlocutory injunction issued in this suit was based on the conclusion that the defendant unions were responsible for the continued and persistent threats, intimidation, coercion, violence, molestation,

interference and mischief to which the employees of the Miami Herald, who had supplanted the striking union members, had been subjected for a period of more than two years. The picketing of the newspaper plant was enjoined because it was clear that it was a part of, and could not be divorced from, the evident general plan with which it was enmeshed.

The evidence adduced at the final hearing was not such as to produce any doubt as to the propriety and necessity for continuing the injunctive order in effect.

The defendant unions persist in the contention that they were not responsible for the illegal activities which gave rise to this litigation. They disclaim any participation in, or knowledge of, such activities. If the numerous incidents and events to which I adverted in granting the temporary restraining order were the activities of outsiders whose conduct the defendant unions could not control or influence, it is most difficult to understand why the outsiders ceased such activities immediately on the issuance of an injunctive order by which they were and are not bound. The court's action has been followed by a four months' period during which there has been no resumption of the threats, intimidation, coercion, violence, molestation, interference and mischief which occasioned the plaintiff employees' appeal to the court for protection.

If the illegal activities were engaged in by persons whose conduct the union leaders could not control or influence, then it follows, as night the day, that no credit or commendation is due the defendant labor organizations for the cessation of such activities. Yet, counsel have pointed to the four months of peace and quiet as a reason why the defendant unions and their members should be released from the injunctive restriction on picketing imposed on them by the court. They argue that "the passage of time has deprived the picketing of its coercive influence."

I disagree. I am thoroughly convinced that the defendant unions were responsible for the illegal activities with which the picketing was enmeshed.

Disclaiming responsibility, the defendant unions nevertheless assure the court that the evils which justified the interlocutory injunction have permanently vanished. I cannot accept the assurance with any confidence.

It is my judgment that there has been no clear showing that there is no longer any necessity for the continuance in effect of the injunctive restrictions.

86

It is therefore ordered and decreed that the interlocutory injunctive order of March 14, 1951 be, and it is, continued in effect and made permanent.

It is further ordered and decreed that the plaintiffs' prayer for damages be, and it is, denied. The plaintiffs, in seeking injunctive relief, have prosecuted this suit jointly for a common purpose. I think that it is improper to prosecute in the same suit the claims of individual plaintiffs for damages occasioned by the bombings and other acts of violence and mischief of which they have been victims. It is my opinion that each plaintiff who has sustained such damages has a separate and independent cause of action not maintainable in this suit in which he and his co-plaintiffs have joined for a purpose common to all. To permit each plaintiff who claims damages to prosecute his claim in this suit would convert it into many suits and would unduly prolong the litigation at great cost.

It is further ordered and decreed that the defendant unions, International Typographical Union and Miami Typographical Union # 430, shall be jointly and severally liable for the costs of this suit; and they are, and each of them is, required and commanded to pay such costs when they shall have been determined and assessed.

It is further ordered and decreed that the court shall, and it does, retain jurisdiction of the cause, but for the sole purpose of enforcing and effectuating the provisions of this final decree.